UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
JENNIFER HOUGH,

        *Plaintiff*,

-- against --

ONIKA TANYA MARAJ, AKA ("NICKI MINAJ") and KENNETH PETTY, AKA ("ZOO").

        *Defendants*.
-------------------------------------------------------X

Case No. 21-cv-04568-ENV-JRC

**DECLARATION OF
ONIKA TANYA MARAJ**

**ONIKA TANYA MARAJ** declares under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1.    I am a Defendant in this case.

2.    I submit this Declaration in opposition to Plaintiff Jennifer Hough's ("Plaintiff") motion (a) for a default judgment against me, and (b) to set a date for an inquest.

3.    This is the second Declaration which I have submitted in this case. My first Declaration was addressed to the issue of whether I was properly served with the Amended Complaint. I have annexed that Declaration as Exhibit A hereto and incorporate it by reference herein.

4.    The purpose of this Declaration is to state the facts concerning (a) the false allegations against me in the Amended Complaint and other papers filed in this case, and (b) my contacts with New York State.

A.     **PLAINTIFF'S COUNSEL HAS MADE FALSE CLAIMS ABOUT EVENTS AFTER THE AMENDED COMPLAINT WAS FILED AND MY SUPPOSED GANG MEMBERSHIP**

6.     I am advised that Plaintiff's attorney, Tyrone Blackburn, has submitted a Declaration stating:

> On October 23, 2021…, Petty and Maraj were both in this district, in Jamaica Queens, New York. As seen on an Instagram live video currently up on Maraj's Instagram page, both Maraj and Petty were seen associating with members of the Makk Ballers set of the Bloods Gang. Petty and Maraj are both members of this gang….
>
> Petty can be visibly seen posing and throwing up gang signs with his fellow Makk Ballers Bloods gang members….
>
> On October 23, 2021, shortly after Petty and Maraj are spotted with their gangster colleagues, a member of the gang posted a death threat to Ms. Hough on Twitter, stating: "Jennifer if you see this, the Makks are coming to get you."

7.     **Plaintiff's counsel's claim that my husband and I are members of the "Makk Ballers," or any other gang, is outrageously and completely false. Further, I did not direct, approve, or know about anyone posting any message on Twitter mentioning Plaintiff, including the message stating, "Jennifer if you see this, the Makks are coming to get you," which Plaintiff says she received.**

8.     As for what happened on the night of October 23, 2021, here are the **facts**:

      a.     On October 23, 2021, my husband and I were driving with our baby to visit my husband's grandmother in Jamaica, Queens;

      b.     As we were driving there, we saw a huge mural of Sean Bell, a man who, in 2016, was shot and killed by the New York City police in Jamaica;

      c.     My husband and I decided to stop and look at the mural;

d.  We did not plan to stop at that location and had no plans to meet with anyone there. However, as is always the case when I appear in public, I was quickly surrounded by my fans, particularly in this instance because my pink Rolls Royce was in the direct sightline of apartment buildings across the street from where I had stopped;

e.  While my husband and I recognized a few friends and acquaintances from the neighborhood that night, including Rico Danna, an artist whom I intend to sign to my label, **none of them belong to any gang**. Further, we did not plan to meet anyone in advance because we had not planned to stop there. Once I came out of the car, the news traveled quickly, and people just showed up;

f.  Neither I, my husband, nor anyone I knew made any "gang" signs that night;

g.  I did not mention Plaintiff or this case that night. Nor did I hear anyone, including my husband, mention Plaintiff or this case that night; and

h.  I videoed my time on the street that evening and streamed it live on Instagram. However, as is almost always the case when I do a live stream, I made the decision to do so on the spur of the moment, and it was not advertised in advance.

3

**B.     PLAINTIFF SENT ME A TEXT WHICH DEMONSTRATES THAT SHE IS LYING**

9.  Other than Plaintiff's allegations that (a) I gave away turkeys in Queens in 2018, and (b) I twice defended my husband on social media, every other allegation against me in the Amended Complaint is either false or misleading.

10. However, before even discussing Plaintiff's allegations in the Amended Complaint about my supposed conduct, I want to inform the Court about a piece of evidence concerning **Plaintiff's conduct** which unquestionably shows that she is making false accusations against me because she mistakenly believes that I will allow her to extort me.

11. Annexed hereto as Exhibit B is an August 31, 2020 text message to me from Plaintiff.[1]  As explained below, I had previously given Plaintiff my phone number.  Her text message read as follows: "US Marshalls are asking questions!!!  They showed up at my house."

12. This text message completely contradicts Plaintiff's false claim that I threatened her or that she was in fear of me because the Amended Complaint alleges that, by August of 2020, Plaintiff and her family had been threatened by people supposedly working on my behalf (which never happened) and had changed her address because she was afraid for her safety. But if this were true, she would **never** have sent me a text asking for help because law enforcement had come to **her** door.  That is the **last** thing someone who was supposedly being threatened by supposed

---

[1]     I only found the text message when, in connection with this case, I was going through my phone on December 6, 2021 because I had a vague recollection that Plaintiff had texted me at some point after we spoke in March or April of 2020.  Indeed, since as explained later in this Declaration, I had never asked Plaintiff for her telephone number, I was not sure if she had sent the text message to me when I recently found it.  Since then, however, my attorney has confirmed that the telephone from which the text message was sent belongs to Plaintiff.

4

"gang members" would do. But it is the **first** thing – suggesting that there was a danger of criminal charges – that someone who is looking for a payoff would do.[2]

13.    I now turn to the other allegations in the Amended Complaint.

## C. PLAINTIFF HAS MISREPRESENTED OUR SINGLE TELEPHONE CALL WITH EACH OTHER

14.    While I did in fact speak once on the telephone with Plaintiff, she has misrepresented both how the call came about and what was said during our call.

15.    My husband was arrested in March 2020 for failing to register as a sex offender in California based upon his 1995 conviction for the attempted rape of Plaintiff. Obviously, as any wife would be, I was upset and concerned for him.[3]

16.    A few days after the arrest, Barry, an old acquaintance from the Queens neighborhood in which we grew up, and known to all of us as "Black," reached out to me to say that Plaintiff wanted to speak to me about what happened in 1994. I did not call Plaintiff. Rather, as I recall what happened, Black connected Plaintiff and me through his phone. As any wife would do in that situation, I told her that I had been informed that she wanted to speak with me about taking back her accusation. However, right from the start, and throughout our call, **I made clear to her that I was not asking her to change her past statements**. I never offered her any money,

---

[2]    My phone shows that I never responded to Plaintiff's text message. However, there is no reason why I would have responded because I would have had no concern about the Marshals visiting her.

[3]    To be clear, I completely believe my husband when he says that he never raped or tried to rape Plaintiff. Rather, as a poor 16-year-old **boy**, he pleaded guilty to attempted rape because he was understandably concerned about being just one more person from his community who found himself spending half his life in prison for a crime he did not commit.

5

**and I never threatened her**.

17. I have no doubt that Plaintiff had wanted to speak with me because she mistakenly believed that I would pay her money to take back her accusation against my husband. While Plaintiff never asked me directly for a payoff to change her story, she did so indirectly by telling me that the indictment against my husband was a "big problem" for him **and** for me. In an effort to make it unmistakably clear that I was not going to pay her money, I responded by telling her that the indictment was my husband's problem, **not mine**, and that he would have to live with the consequences of having chosen years ago to plead guilty to a crime which he did not commit.

18. After I had made it clear to her that I was not going to pay her any money, Plaintiff told me she would think about what she wanted to do. Then, referring to her claim that my husband had raped her, **she said verbatim: "I'm not saying it didn't happen, but maybe it was just a misunderstanding."** I could not believe what I had just heard. I could not believe that it was so easy for this woman to imply that she may have exaggerated or lied after how much this man had suffered through as such a young boy. Even then, though, I did not pressure her in any way. I only told her that **IF** she would like to change her statement and wanted help drafting something, my publicist, Joe Carozza, could possibly help her. I gave Plaintiff my telephone number and told her that she could call me if she would like to discuss the matter with me again.

19. I never called Plaintiff, nor did I ever want to speak to her. I spoke to her only because Black told me that she had asked to speak to me. **Further, during the call, I never asked her to change her story; I never offered her any money in return for a statement; and I did not threaten her with any type of harm if she chose not to provide a statement. In fact, I emphatically told her that I did not want her to lie about anything and to tell the truth about**

6

**what she had just revealed to me <u>only if she was comfortable with doing so</u>**.

### D. I NEVER DIRECTED NOR ASKED ANYONE TO BRIBE, HARASS OR THREATEN PLAINTIFF

20. Other than her misrepresentation of our telephone call, Plaintiff does not claim that I ever communicated with her again. Instead, she claims that I directed others to bribe, harass and threaten her. This accusation is false. **I never directed anyone to communicate with Plaintiff, let alone bribe, threaten, or harass her. And in the unlikely event that anyone engaged in that conduct, it was without my knowledge or approval**. Obviously, if I had wanted to pay Plaintiff money to secure a statement from her, I would have made the offer myself during our call or thereafter (as I had her telephone number), instead of sending others to do so less directly. Further, as discussed above, if I had been threatening Plaintiff, she would never have sent me a text asking for "help" because the Marshals had come to her home.

21. More specifically:

22. I did not direct, approve, or know about anyone supposedly offering a member of Plaintiff's family $500,000 in return for Plaintiff writing a letter recanting her accusation against my husband.[4]

23. I did not direct, approve, or know about anyone supposedly sending Charles Mittlestalt (whom I do not know) to speak to Plaintiff.

24. I did not direct, approve, or know about anyone supposedly recommending Plaintiff to Ian Wallach (whom I also do not know), or offering to pay his fees.

---

[4] To be clear, I am **not** conceding that the Amended Complaint's allegations of conduct by others are true. But regardless, I did not direct, approve of, or know about any of the supposed actions of others which are alleged in the Amended Complaint.

7

25. I did not direct, approve, or know about Black supposedly telling Plaintiff that "nothing would happen to [her] if she signed and notarized some papers in his possession."

26. I did not direct, approve, or know about Black supposedly offering Plaintiff $20,000.

27. I did not direct, approve, or know about anyone, including Black, supposedly seeking to bribe Plaintiff.

28. I did not direct, approve, or know about Black supposedly offering to have me send happy birthday videos to Plaintiff's daughter.

29. I did not direct, approve, or know about anyone supposedly threatening that someone would show up at Plaintiff's home if she did not sign a statement recanting her accusation.

30. I did not direct, approve, or know about any lawyer, either representing me or my husband, supposedly contacting Plaintiff.

31. I did not direct, approve, or know about anyone supposedly approaching Plaintiff's daughter either at an Atlanta event or at any other time.

32. I did not direct, approve, or know about the alleged August 2021 Instagram post by Black which is discussed in the Complaint.

E. **I HAVE NOT LIVED IN NEW YORK STATE FOR MANY YEARS**

33. While I grew up in Queens, New York, I have not lived in New York State for more than ten years.

34. I do not own any real property in New York State.[5]

35. I do not own or operate a business in New York State.

36. I do not maintain a New York State driver's license.

37. I do not pay New York State income tax.

38. To the best of my recollection, with the exception of my return to New York State earlier in 2021 for approximately two weeks because my father had died, I have visited New York State twice in the past two years: (a) approximately three days in May 2020 for a video shoot, and (b) approximately two weeks last October to host a television special.

39. In general, I rarely visit New York State.

40. I have lived in the State of California since 2009.  Prior to that, I was a resident of the State of Georgia.

41. As shown by Exhibit C hereto, I pay taxes as a California resident.

42. As shown by Exhibit D hereto, I maintain a California driver's license.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 30, 2021 in the State of California, Los Angeles County.



ONIKA TANYA MARAJ

---

[5] For the sake of completeness, I note that I am the grantor, but not the trustee, of a trust which owns a house on Long Island in which my mother lives.