# **EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JENNIFER HOUGH,<br><br>                        Plaintiff,<br><br>   -against<br><br><br><br>ONIKA TANYA MARAJ, AKA<br>("NICKI MINAJ")<br>an individual,<br>KENNETH PETTY, AKA ("ZOO"),<br>an individual<br>                       Defendants. | **FIRST AMENDED COMPLAINT**<br>Civil Action No. 21-4568<br><br><br>**JURY DEMANDED** |

       Plaintiff Jennifer Hough ("Hough" or "Plaintiff") brings claims for witness intimidation, intentional infliction of emotional distress, negligent infliction of emotional distress, harassment, assault, battery, sexual assault, and sexual harassment against Defendant Kenneth Petty ("Petty" or "Defendant Petty"), and Defendant Nicki Minaj ("Defendant Minaj") (collectively "Defendants"), and now alleges as follows:

1. Plaintiff's claims include, but are not limited to, witness intimidation, intentional infliction of emotional distress, negligent infliction of emotional distress, harassment, assault, battery, sexual assault, and sexual harassment by Defendants.

2. Plaintiff seeks to hold Defendants liable under various legal doctrines, including without limitation, vicarious liability, strict liability, respondeat superior, aiding and abetting liability, and other grounds.

<u>**JURISDICTION AND VENUE**</u>

3. This Court has personal jurisdiction over Defendants under and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents, intermediaries, or apparent agents, committed one or more of the following:

    i.    The transaction of any business within the state;

    ii.    The making of any contract within the state;

1

iii.   The commission of a tortious act within this district[1]; and

iv.   The ownership, use, or possession of any real estate situated within this state.

4.   The Court has supplemental jurisdiction over Plaintiff's related claims under state and local law under 28 USC § 1367(a).

5.   Plaintiff is a resident of Florida, while the Defendants are both domiciled in California.

6.   Plaintiff felt the bulk of Defendant's action in the states of Georgia and New York.

7.   Damages far exceed the $75,000.00 threshold for diversity jurisdiction.

## PARTIES

8.   Plaintiff is a resident of Florida and was a resident of the State of New York at sixteen years old when raped by Petty. Plaintiff is currently 43 years old.

9.   Petty is a rapist, a registered sex offender, a level-two sex offender, and pled guilty to First Degree Manslaughter following gunfire that resulted in the unnecessary death of a young man. According to Petty's sex offender registry, he was born April 7, 1978, and is currently 43.

10.   Defendant Onika Tanya Maraj-Petty ("Nicki Minaj") is a Trinidadian-born rapper, singer, songwriter, and American actress.

11.   Defendant Minaj and Petty were married on October 22, 2019, as reported on Defendant Minaj's online social media.

12.   Defendant Minaj and Petty are both residents of California.

## FACTS COMMON TO ALL CAUSES OF ACTION

13.   Plaintiff knew Petty from their childhood neighborhood of Jamaica, Queens, New York. Plaintiff was never in a relationship with Petty and simply knew him from the neighborhood.

14.   Plaintiff has never personally known Defendant Minaj.

15.   In violation of his 1994 plea deal, Petty failed to register as a sex offender in California. The United States Attorney's Office for the Central District of California prosecuted Petty for failing to register as a sex offender[2]. Petty has since taken a plea deal for failing to register as a sex offender[3].

---

[1] Defendant raped Plaintiff in the borough of Queens, which falls within the EDNY.
[2] Case # 20-CR-00108-MWF.
[3] As of the date of this document, Petty is still awaiting sentencing.

2

16. In violation of his 1994 plea deal, Petty directly and indirectly intimidated Plaintiff not to speak out concerning the rape she experienced at the hands of Petty.

17. In violation of his 1994 plea deal, Petty, directly and indirectly, threatened Plaintiff not to speak out concerning the rape she experienced at the hands of Petty.

18. In violation of his 1994 plea deal, Petty, directly and indirectly, harassed Plaintiff not to speak out concerning the rape she experienced at the hands of Petty.

19. In violation of his 1994 plea deal, Petty, directly and indirectly, reached out to Plaintiff's family members to ensure Plaintiff would not speak out concerning the rape she experienced at the hands of Petty.

20. Defendant Nicki Minaj indirectly attempted to intimidate Plaintiff into recanting her legitimate claim that Petty raped her.

21. Defendant Nicki Minaj, directly and indirectly, harassed Plaintiff to recant her legitimate claim that Petty raped her.

22. Defendant Nicki Minaj indirectly threatened Plaintiff to recant her legitimate claim that Petty raped her.

23. Defendant Nicki Minaj, directly and indirectly, reached out to Plaintiff's family members to ensure Plaintiff would recant her legitimate claim that Petty raped her.

24. Defendant Minaj lied to her social media followers and "Queen Radio" listeners about what transpired when her spouse Petty raped Plaintiff to prevent her rapist spouse from registering as a sex offender in California.

25. As a direct result of the actions of Defendant Minaj and Petty, Plaintiff has been traumatized her entire life.

26. Plaintiff has been abused and manipulated her entire life. Plaintiff has been harassed and intimidated her entire life.

27. Plaintiff has never felt safe since being raped by Petty.

28. Plaintiff has moved to multiple states to avoid intimidation and harassment by Defendant Minaj, Petty, and their allies, legal teams, and fans.

## TIMELINESS UNDER THE CHILD VICTIMS ACT[4]

29. This action is timely because it falls within CPLR 214-g and is brought during the period outlined in that section. The claims brought herein allege intentional and negligent acts and omissions for physical, psychological, and other injury suffered because of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and omissions were committed against Plaintiff when she was less than eighteen years of age.

30. Specifically, the conduct that gives rise to Plaintiff's claims herein would constitute a violation of, among other things, New York Penal Law, 130.35 (rape in the first degree), 130.52 (forcible touching) (collectively, the "Child Sex Crimes").

---

[4] The opening paragraph of section 208 of the civil practice law and rules is designated subdivision (a), and a new subdivision (b) is added to read as follows:

(b) Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or particular proceeding, with respect to all civil claims or causes of action brought by any person for physical, psychological or other injury or condition suffered by such person as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was less than eighteen years of age, incest as defined in section 255.27, 255.26 or 255.25 of the penal law committed against such person who was less than eighteen years of age, or the use of such person in a sexual performance as defined in section 263.05 of the penal law, or a predecessor statute that prohibited such conduct at the time of the act, which conduct was committed against such person who was less than eighteen years of age, such action may be commenced, against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of said conduct, on or before the Plaintiff or infant plaintiff reaches the age of fifty-five years. In any such claim or action, in addition to any other defense and an affirmative defense that may be available under the law, rule, or the common law, to the extent that the acts alleged in such action are of the type described in subdivision one of section 130.30 of the penal law or subdivision one of section 130.45 of the penal law, the affirmative defenses set forth, respectively, in the closing paragraph of such sections of the penal law shall apply.

The civil practice law and rules are amended by adding section 214-g to read: § 214-g—certain child sexual abuse cases. Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or particular special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age, incest as defined in section 255.27, 255.26 or 255.25 of the penal law committed against a child less than eighteen years of age, or the use of a child in a sexual performance as defined in section 263.05 of the penal law, or a predecessor statute that prohibited such conduct at the time of the act, which conduct was committed against a child less than eighteen years of age, which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the Plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section. In any such claim or action: (a) in addition to any other defense and an affirmative defense that may be available under the law, rule, or the common law, to the extent that the acts alleged in such action are of the type described in subdivision one of section 130.30 of the penal law or subdivision one of section 130.45 of the penal law, the affirmative defenses set forth, respectively, in the closing paragraph of such sections of the penal law shall apply; and (b) dismissal of a previous action, ordered before the effective date of this section, because such previous action was time-barred, and for the failure of a party to file a notice of claim or a notice of intention to file a claim, shall not be grounds for dismissal of a revival action under this section.

## FACTUAL ALLEGATIONS

## KENNETH PETTY VIOLENTLY RAPED PLAINTIFF HOUGH

31. September 16, 1994, is a date now burned into Plaintiff's memory and soul forever. Plaintiff, a sixteen-year-old girl, left her grandmother's house in Jamaica, Queens, and was headed to the Q7 MTA bus stop on 145th street and Rockaway Blvd. to catch the bus for school.

32. Petty was standing at the bus stop when Plaintiff got there. Petty was known as a delinquent that opted not to go to school, instead choosing to spend his days scouring the streets of Jamaica Queens.

33. On September 16, 1994, when Plaintiff arrived at the bus stop, she was taken aback at the site of Petty waiting at the bus stop. Petty's custom is to stand outside the store across the street from the bus stop, not the bus stop itself.

34. Plaintiff stood at the bus stop but did not address Petty. Defendant Petty asked Plaintiff, "where are you going" to which Plaintiff responded, "to school, where are you going?" to which Petty answered, "I am going to school also."

35. Plaintiff did not believe him because she knew Petty never went to school, so she responded, "yeah, right."

36. After that brief exchange, Plaintiff turned her back to Petty to look to see if the Q7 bus or a dollar van[5] was coming.

37. As she turned her back, Petty approached her from behind. Petty grabbed the back of Plaintiff's jacket firmly and pressed a knife into her back, and told her to "start walking."

38. Plaintiff tried to turn around, but Petty would not let her go, nor would he take the knife from her back.

39. Plaintiff began pleading for her life; "Kenny, where are we going?" "Kenny, please just let me go." Petty did not let her go. He already made up in his depraved mind that he was going to rape Plaintiff.

40. Petty walked Plaintiff to a house around the corner from the bus stop, not letting go of his grip

---

[5] A dollar van is a mode of transportation that transports to short distances for only a dollar. Plaintiff's school was located twenty city blocks away from the bus stop.

on her clothing, and with the knife still pressed firmly into her back.

41. Petty kicked the door to the house open, pushed Plaintiff inside, and walked her upstairs, still at knifepoint.

42. Plaintiff was crying the whole way up the stairs, pleading for her life, absolutely terrified of what will happen to her.

43. Plaintiff pled to Petty, "what do you want from me?", "Why am I here?"

44. Petty replied to her as she pled through her tears, only stating, "you know what I want." Plaintiff ensues in a struggle with Petty, fighting for her life to get this rapist off her.

45. Petty held her down with his bodyweight and used his hands to forcibly rip off her pants, prying them off her small sixteen-year-old frame.

46. Plaintiff was fighting back with all the strength she had.  Then Petty grabs the knife again, presses it into Plaintiff's stomach, causing a small cut, and threatens to use it further.

47. Petty begins to squeeze Plaintiff's sides to force her to let go of her pants.

48. After being threatened with a knife cut on her stomach, Plaintiff had no fight left in her.  Seeing no escape in sight, Plaintiff did the only thing she could do to save her life, and that was to give in and hope her rape would be over quickly.

49. Once Petty got off Plaintiff, he stood in the mirror and beat on his chest, stating, "I am the man, I am the man" repeatedly.

**THE ESCAPE**

50. Plaintiff mustered all her strength and courage to get back up once again and asked Petty, "can I please leave."

51. Plaintiff attempted to walk towards the door and was blocked by Petty, who prevented her from leaving.

52. All Plaintiff could do at this point was to beg and plead to her rapist for her freedom, "please let me go," "I promise I won't say anything," saying anything to get out of that house.

53. Petty is still admiring himself after the violent rape in the mirror and attempts to light a cigarette to celebrate his depravity.

54. Quickly thinking, Plaintiff said, "let me light it for you," she lights the match and attempts to

throw the lit flame towards a roll of toilet paper on the dresser in front of her in hopes of setting the toilet paper ablaze. The flame goes out before it reaches the toilet paper roll.

55. She then grabbed a contact solution container on the dresser. She threw it with whatever strength she had left at Petty's head.

56. As Petty ducked from the contact solution, Plaintiff pushed him with all her might, he fell, and she sprinted down the stairs.

### "NOBODY IS GOING TO BELIEVE YOU"

57. Petty quickly gets up and yells down the stairs, as Plaintiff is running, a sentence that followed her for the rest of her life "NOBODY IS GOING TO BELIEVE YOU."

### SIXTEEN-YEAR-OLD PLAINTIFF
### IMMEDIATELY REPORTS THE RAPE

58. Plaintiff did not stop running, and she sprinted at least 20 blocks until she reached John Adams High School.

59. Once there, she informed the school security guards of what happened, and they immediately contacted the police.

60. Once the police arrived, they questioned Plaintiff. They placed her in a van to go to the house to confirm the location of her rape and to arrest Petty.

61. Petty was still in the house where he raped Plaintiff, and he was arrested on the spot. Plaintiff confirmed his identity, and then the police took Petty to the police station and took Plaintiff to the hospital to be checked out.

### VICTIM BLAMING

62. Plaintiff's "friend" brought her home from the hospital, and this was the first of many people who victim-blamed her. Hours after being violently raped, Plaintiff's friend said, "I am sorry you got raped, but you should have screamed."

63. The day after their son raped Plaintiff, Petty's parents showed up at Plaintiff's house, beginning the chain of never-ending lies and harassment Plaintiff has had to face.

64. In a clueless delusional rant, the parents of Petty stated that Plaintiff was only accusing Petty of rape out of anger. Pettys' parents claimed that Petty no longer wanted to date Plaintiff.

7

65. Plaintiff <u>NEVER</u> dated Petty, nor even knew him aside from seeing him in the neighborhood and hearing about him via word of mouth. They were never romantic in any way before Petty raped her.

66. Petty's parents even took Plaintiff to the Queen's District Attorney. They pretended to be Plaintiff's aunt and uncle to get Plaintiff to drop the charges against Petty.

## **PLAINTIFF IS VICTIM-BLAMED BY HER FAMILY**

67. Shortly after the visit from Petty's parents, the Plaintiffs' household began receiving death threats. Rumors circulated in the neighborhood that something would happen to Plaintiff if she did not drop the charges. Jamaica Queens is a tough neighborhood, and threats of that nature are not taken lightly.

68. At this point, the Plaintiffs' family is beginning to turn on her because they did not want any violence from Petty and his associates brought to their doorstep.

69. Plaintiff, a sixteen-year-old girl, felt more alone than ever before. Plaintiff had just been brutally raped; she could not go outside without the fear of being retaliated against for telling the police, and now she is afraid to be home because she was being threatened by outsiders for telling the police and by her family for bringing violence to their home.

70. Plaintiff was constantly beaten and verbally abused in the street and her home because everyone wanted her to drop the charges against Petty.

## **PLAINTIFF SUFFERS PHYSICAL VIOLENCE AS A**
## **RESULT OF DEFENDANT PETTYS PLEA**

71. On the day of Petty's criminal proceeding, Plaintiff's family forced her to go to the hearing even though she did not have to be there. She was not testifying because Petty had already taken a plea deal. Plaintiff hid in the stairwell the whole time mentally in shambles.

72. The Queens District Attorney happened to take the stairs that day and ran into the Plaintiff sitting in the stairs and asked what she was doing there. Plaintiff told the truth and said, "They are forcing me to drop the charges." The DA responded that she would handle it.

73. When everyone was in Court, the Judge asked if anyone had anything to say, and the Plaintiff stood up and stated that she wanted to drop the charges. The Judge did not find that statement

very convincing and stated, "take that up with the District Attorney."

74. Plaintiff was beaten at home that day because she was not convincing enough for the Judge. The family was afraid of what would happen because Petty was now facing prison time.

## PLAINTIFF IS CHASED OUT OF NEW YORK CITY

75. Due to the mental trauma from the ordeal, the constant beating, and verbal abuse at home, Plaintiff ran away from New York City and moved to Florida with her uncle, whom she thought would protect her.

76. Her uncle ended up raping her shortly after her arrival. Plaintiff left her uncles home in Florida and has been on her own ever since.

## THE ENSUING YEARS

77. Plaintiff was mentally and emotionally destroyed and attempted to find value and kindness in anything she could—partying, drugs, living in the streets, in and out of shelters. Plaintiffs' self-worth was at zero, her emotions were empty, and she was lost.

78. Plaintiff moved around a lot because she was too afraid to go back to New York for fear of someone recognizing her. Plaintiff had four children, numerous failed relationships, and never knew a true home in her entire life.

## KENNETH PETTY AND NICKI MINAJ
## INTIMIDATE AND HARRASS PLAINTIFF

79. In 2016, Plaintiff moved to Atlanta, Georgia, where she met her husband, whom she wed in 2018. She was finally beginning to learn to be happy and love herself.

80. In 2018, Defendant Minaj posted that she was doing a turkey giveaway in Queens, New York, on Rockaway Blvd. and 147th street. This attracted much attention given how big of a star Defendant Minaj is, and since Queens was her hometown.

81. On November 25, 2018, Defendant Minaj posted a picture of her and Petty, the man who raped Plaintiff at knifepoint. It appeared that they were dating, and in the photo, they were throwing up gang signs.

82. Toward the end of November, Defendant Minaj posted another picture of her and Petty and

9

replied to a comment stating, "Kenny was 15, she was 16 and, in a relationship, but go awf Internet." (**Exhibit A**). This was picked up by every publication, tabloid, iheartradio, USA today, bloggers and YouTubers, etc.

83. As a result of Defendant Minaj's post, Plaintiff was sought after for comment. Seeing no choice than to defend the truth, Plaintiff recorded an interview with a YouTube blogger, giving her side of the story. Plaintiff thought that would be the end of it.

## DEFENDANT MINAJ USES HER CELEBRITY
## PLATFORM TO BASH PLAINTIFF

84. In November 2019, Defendant Minaj did a show called "shade no shade" on Queen radio. She repeated the same comment that Petty was 15 years old but now added that he was "wrongly accused," "he did not have bail money," and said that Plaintiff had "written a letter recanting her statement" but would face 90 days in jail if Plaintiff had done so – which was all false.

85. Defendant Minaj also stated, "but white is right," because Plaintiff is biracial.

86. These statements by Defendant Minaj put social media in a frenzy trying to figure out who Plaintiff was, if she was a white woman, and where she currently lived.

## KENNETH PETTY IS ARRESTED FOR
## FAILURE TO REGISTER AS A SEX OFFENDER

87. In March 2020, Petty was arrested for failing to register as a sex offender in California.

88. A few days after the arrest the Plaintiff was contacted by an old childhood friend, "Black." They caught up, and the topic of Plaintiff's rape came up, to which Plaintiff stated, "she wished it could all just go away forever." Black responded, "I can make that happen."

89. A few days later, Black called Plaintiff and informed her that Defendant Minaj asked for Plaintiff's phone number and that he had given it to her. Shortly after that, Defendant Minaj called Plaintiff.

90. During the call, Defendant Minaj stated she heard Plaintiff was willing to "help out" their situation and stated that she would fly Plaintiff and her family to Los Angeles. Plaintiff declined this offer.

91. Defendant Minaj then stated she would send her publicist to meet with Plaintiff to craft a

10

statement recanting Plaintiff's rape charge.  Plaintiff denied this offer as well.

92. Before they got off the phone, Plaintiff said to Defendant Minaj, "I need you to know woman to woman, that this happened."  Defendant Minaj hung up the phone.  Within days of this conversation, Plaintiff and her family suffered an onslaught of harassing calls and unsolicited visits.

## DEFENDANT MINAJ SENDS HER ASSOCIATES AND ATTORNEYS TO HARASS AND INTIMIDATE PLAINTIFF

93. A few days after Defendant Minaj called Plaintiff, Plaintiff's brother called her.  He stated two people reached out to a family member stating there is an offer of $500,000.00 from Defendant Minaj if Plaintiff wrote a letter recanting her rape claim against Petty.  Plaintiff hung up, distraught that Defendant Minaj's instructed her associates to contact her brother, and her brother would even relay such a message.

94. This act by Defendant Minaj and her associates caused Plaintiff to panic because Black, who was in contact with Defendant Minaj, now knew where Plaintiff lived, where Plaintiff worked, and the identity of Plaintiff's kids.

## DEFENDANT MINAJ SENDS LAWYERS AND INVESTIGATORS TO PLAINTIFF'S HOUSE

95. In April 2020, on behalf of Petty, factfinder/investigator Charles Mittlestalt from Georgia contacted Plaintiff.  He put Plaintiff in contact with an attorney named Ian Wallach ("Attorney Wallach") from New York.

96. Defendant's legal team hired Attorney Wallach to give Plaintiff "legal advice" about recanting her statement.

97. Attorney Wallach stated he was the Plaintiffs' lawyer, and anything said to him was protected under attorney-client privilege.  Plaintiff did not know Attorney Wallach and had not reached out to him for legal services.

98. Plaintiff told Attorney Wallach Defendant Minaj and Petty was sending people to her home and to the homes of her loved ones to get her to recant her true statement that Petty violently raped her.

11

99. Plaintiff told Attorney Wallach that the Defendants were harassing her. Attorney Wallach promised to "help her," but his efforts were lackluster at best.

## DEFENDANT MINAJ SENT BLACK TO PLAINTIFF'S HOUSE

100. Black continues to receive and relay messages from the Defendants to Plaintiff. For a while, Plaintiff ignored Black's calls. Plaintiff finally answered, and he tells her that he had good news. Black stated that nothing would happen to Plaintiff if she signed and notarized some papers in his possession.

101. Shortly after the call, Black appeared in front of Plaintiff's home. To protect her children in her home, Plaintiff met Black in front of her house in his car. While in his car, Black pulled out a green-colored folder that had a document inside. This document was a written recanted statement prepared for Plaintiff to sign.

102. Black then pulls twenty thousand dollars out of the armrest and places it on the Plaintiff's lap. Plaintiff took the money off her lap and placed it on the floor. Plaintiff could not believe that Defendant Minaj would go this far to bribe her.

103. Black even said that Defendant Minaj would also send happy birthday videos to Plaintiff's daughter for her birthday as a bonus.

## PLAINTIFF SUFFERS

104. During these unsolicited calls, contacts, and communications, Plaintiff is having nightmares. The memories began to flood back from the day of her rape. She begins to experience anger, pain, sorrow, anxiety, and trust issues. The Plaintiff starts having crying fits and thoughts of paranoia.

105. At the end of May 2020, Plaintiff received a call from her brother where he was speaking frantically. The brother stated that they know where she lived, what her daughter does, and threatened to have someone else show up at the Plaintiff's house if she did not recant her 1994 rape claim.

106. After receiving this threat, Plaintiff moved in June of 2020. She changed her phone number, registering her new number under her husband's name. These efforts by Plaintiff were unsuccessful in curbing the harassment and unwanted contact. Shortly after changing

12

her number, Plaintiff was contacted by a lawyer who was instructed to reach out to her by Defendant Minaj.

107. Plaintiff became so paranoid that she moved again in August 2020.

### THE UNITED STATES MARSHALS
### CONTACTS PLAINTIFF HOUGH

108. Three days after moving in August 2020, the U.S. Marshals showed up at the Plaintiff's husband's job. She called the U.S. Marshals, and they stated that someone had called them to report that Plaintiff was being harassed and they were worried about her safety.

109. The Marshals offered Plaintiff witness protection. The Marshals also confirmed with Plaintiff that the call she received from California was indeed Defendant Minaj.

### PLAINTIFF IS CONTACTED BY
### KENNETH PETTY'S LEGAL COUNSEL

110. In September 2020, while visiting her brother in South Carolina, Plaintiff is once again harassed. Plaintiff gets a call from a New York Attorney stating that they represent Petty.

111. The attorney states they were trying to go to Court to get Petty off the sex offenders registry and asked about the recantment letter and if Plaintiff wrote it.

### PLAINTIFF HOUGH MOVES TO FLORIDA
### TO PROTECT HER FAMILY

112. In October of 2020, Plaintiff 's daughter was at an event in Atlanta, Georgia. At the end of the night, Plaintiff's daughter and her friend group were approached by a man. The man asked, "do you know Zoo?" (Zoo is Petty's Street name). Plaintiff's daughter yelled at the man and left with her friends. Not even Plaintiff's daughter was safe from the intimidation tactics and harassment by Defendant Minaj.

113. After this incident the Plaintiff again feared for her and her family's safety, so she moved again, this time to Florida. She was afraid her child would be killed or kidnapped due to the threats from Defendant Minaj and Petty.

114. In November of 2020, Plaintiff put a YouTube video out speaking about everything she had been going through in hopes of creating a digital footprint just in case something was to happen to her.

13

115.    Bloggers caught wind of the YouTube video and began victim-shaming her, telling their audiences that Plaintiff was lying, that she was just a white woman trying to make a quick dollar out of the limelight.  Defendant Minaj's fans claimed, "Nicki said it was a lie, so it is a lie."

116.    Plaintiff has not worked since May of 2020 due to severe depression, paranoia, constant moving, harassment, and threats from the Defendants and their associates.  She is currently living in isolation out of fear of retaliation.

### DEFEDANTS INTERMEDIARY PUBLICLY THREATENS PLAINTIFF HOUGH

117.    On or about August 12, 2021, within days of Petty reaching a plea agreement in the Central District of California for his failure to register as a sex offender, Defendant's intermediary Black posted a threat to Plaintiff on his Instagram social media account.

118.    In the post, Black said, "Case is over now," referring to the federal criminal case Petty accepted the plea deal for in the Central District of California.

119.    The video went onto say:
> "Jon Wayne tv coming soon tell that bitch she will be expose case over now 20k huh,"

> "u know u don't fucked uped,"

> "Jon wayne tv,"

> "you lying ass bitch, 20 thousand,"

120.    Black ends the montage with a photo of two guns circled, with the words "be safe out here lol" written on the photo. (**Exhibit B**).

121.    In fear for her life and safety, Plaintiff filed a police report in Florida and has since moved to another state out of fear of being found and killed by Petty or one of his intermediaries.

14

## COUNT I
## Against Petty
## Intentional Infliction of Emotional Distress (New York)

122.      Plaintiff repeats and realleges by reference all paragraphs above as though fully set forth herein.

123.    To state a claim for intentional infliction of emotional distress, a plaintiff must plead: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." Howell v. N.Y. Post Co., 81 N.Y.2d 115, 122, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993); see Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 158 (2d Cir. 2014) (outlining test for intentional infliction of emotional distress). Frederick v. City of N.Y., No. 13-CV-897 (MKB), 2016 U.S. Dist. LEXIS 39828, at *81 (E.D.N.Y. Mar. 25, 2016).

124.    Petty's extreme and outrageous conduct alleged in this complaint, including but not limited to sexual assault, rape, harassment, and intimidation was intentionally and maliciously committed with intent to deliberately inflict humiliation, mental anguish, and emotional and physical distress upon Plaintiff, and done in wanton and reckless disregard of such consequences to Plaintiff.

125.    As a direct and proximate result of said extreme and outrageous conduct by Petty, Plaintiff did suffer humiliation, mental anguish, disassociation, suicidal ideation, and emotional and physical distress, and have been hurt and injured in her health, both mentally and physically, strength, activity, and her ability to lead an everyday life without mental anguish. All of which have caused, continue to cause and will continue to cause Plaintiff great mental and physical pain and suffering for the rest of her life.

126.    As a result of such severe emotional and mental distress, Plaintiff has been generally, especially, and consequentially damaged in an amount to be established according to evidence.

127.    Petty's behavior toward Plaintiff was so outrageous as to exceed all reasonable bounds of decency. Petty knew with substantial certainty or should have known that his behavior would cause Plaintiff to be a victim of sexual assault, sexual abuse, and sexual contact.

128.    Petty knew with substantial certainty or should have known that his behavior would cause

severe emotional distress to Plaintiff.

129. Petty committed the infliction of emotional, physical, and mental distress willfully and intentionally and through coercion, oppression, fraud, and malice and consciously disregard Plaintiff's rights. Therefore, Plaintiff is entitled to an award of exemplary or punitive damages in an amount to be established at trial to meaningfully punish Petty, thereby deterring similar conduct in the future.

## COUNT II
## Against Petty
## Assault & Battery (New York)

130. Plaintiff repeats and realleges by reference all paragraphs above as though fully set forth herein.

131. Petty, through the conduct described further herein, created an unwarranted threat of violence against Plaintiff. Petty's conduct was made with the intent to provoke observation of the threat and cause a reasonable observation of the immediate danger. Petty has and possesses the present capacity to bring about violence.

132. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoying life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life. Petty's actions and omissions warrant an award of punitive damages.

133. Recovering damages for an assault requires proof of physical conduct, placing the Plaintiff in imminent apprehension of harmful contact. To recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, and that the Defendant intended to make contact without the Plaintiff's consent (see Holtz v Wildenstein & Co., 261 A.D.2d 336, 693 N.Y.S.2d 516; Roe v Barad, 230 A.D.2d 839, 647 N.Y.S.2d 14). Bastein v. Sotto, 299 A.D.2d 432, 433, 749 N.Y.S.2d 538, 539 (App. Div. 2002).

134. Petty committed a battery against Plaintiff because he intentionally engaged in unlawful,

16

intentional, and offensive touching or application of force to Plaintiff's person. Here, Petty committed several acts of battery:

    i.    Petty grabbed Plaintiff from behind and placed a knife behind her back,

    ii.    Petty cut Plaintiff with the knife on her stomach as he wrestled with her to remove her pants,

    iii.    Petty grabbed Plaintiff by her sides to inflict pain to cause Plaintiff to release her pants,

    iv.    Petty forcibly inserted his erected penis into Plaintiff's vagina.

135.    As a result of Petty's conduct, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, paranoia, depression, anxiety, economic harm, and other consequential damages.

136.    The conduct of Petty described above was willful, wanton, and malicious. At all relevant times, Petty acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and humiliation to Plaintiff, and intended to cause fear, physical injury and pain, and suffering to Plaintiff. By the preceding, Plaintiff is entitled to recover punitive and exemplary damages from Petty.

137.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoying life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

## COUNT III
### Against Petty
### Sexual Assault (New York)

138.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

139.    Allegations of sexual intercourse by forcible compulsion, if proven, potentially constitute criminal rape under New York law. See New York Penal Law § 130.35(1) ("A

17

person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [b]y forcible compulsion."). "In the civil context, the common meanings of 'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching." See Girden, 262 F.3d at 203 (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993) and citing 6A N.Y. Jur. 2d Assault—Civil Aspects § 2). Rape indisputably encompasses civil assault and battery under New York law. United Nat'l Ins. Co., 994 F.2d at 108. Antoine v. Brooklyn Maids 26, Inc., 489 F. Supp. 3d 68, 106 (E.D.N.Y. 2020).

140. Petty, in doing the things herein alleged, including intending to subject Plaintiff to sexual abuse and harassment by Petty during Plaintiff's time as a sixteen-year-old high school student. Petty intended to cause harmful or offensive contact with Plaintiff's person or intended to put Plaintiff in imminent apprehension of such contact.

141. In doing the things herein alleged, Plaintiff was put in imminent apprehension of Petty's harmful or offensive contact, and Petty made harmful or offensive contact with Plaintiff's person.

142. Plaintiff did not consent to Petty's intended harmful or offensive contact with Plaintiff's person or intent to put Plaintiff in imminent apprehension of such contact. Additionally, because Plaintiff was a minor during the time herein alleged, she could not consent to sexual contact with any person.

143. In doing the things herein alleged, Petty violated Plaintiff's rights under Civil Code section 43 of protection from bodily restraint or harm and personal assault.

144. As a result of the above-described conduct, the Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life. Plaintiff has sustained loss of earnings and earning capacity.

145. In subjecting the minor Plaintiff to the wrongful treatment herein described, Petty acted willfully and maliciously with intent to harm both Plaintiffs and in conscious disregard of both

Plaintiffs rights, to constitute malice and oppression. Therefore, the Plaintiffs are entitled to the recovery of punitive damages, in an amount determined by the Court, against Petty, in a sum to be shown according to proof.

146.     Defendant's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

**COUNT IV**
**Against Petty**
**Negligent Infliction of Emotional Distress**
**(New York and California)**

147.          Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

148.     Negligent infliction of emotional distress requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress. Simpson v. Uniondale Union Free Sch. Dist., 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010); see Higgins, 318 F.3d 422, 425 n.1 (2d Cir. 2003) (stating that to be actionable, intentional and negligent infliction of emotional distress claims must "be based on conduct that is extreme and outrageous."); Naughright v. Weiss, No. 10 Civ. 8451, 826 F. Supp. 2d 676, 2011 U.S. Dist. LEXIS 133742, at *45-46 (S.D.N.Y. November 18, 2011) ("A cause of action for either intentional or negligent infliction of emotional distress must allege that the defendants' conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Romero v. City of N.Y., 839 F. Supp. 2d 588, 631 (E.D.N.Y. 2012)

149.     Here, the actions of Petty rise beyond the threshold of extreme and outrageous.  As previously mentioned, Petty viciously raped Plaintiff and admitted doing so within hours of committing the act.

150.     In the days, months, and years proceeding his criminal act, Petty, his enabling parents, associates, legal team, gang affiliates, agents, and servants worked in concert and engaged in conduct that rise beyond the threshold of extreme and outrageous.  The extreme and outrageous conduct are as follows:

19

    i.    Stalking Plaintiff,

    ii.    Stalked Plaintiff's twenty-two-year-old daughter,

    iii.    Stalking Plaintiff's family members,

    iv.    Causing Plaintiff to move residents on multiple occasions throughout the years,

    v.    Bribing Plaintiff into recanting her rape claim,

    vi.    Threatening Plaintiff with physical bodily harm if she did not recant her rape claim, and

    vii.    Threatening Plaintiff with death via social media posts.

151.    Under California law, NIED has the following elements: (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate [or legal] cause between the breach and (4) the Plaintiff's injury." Keen v. American Home Mortg. Servicing Inc., 664 F. Supp. 2d 1086, 1096 (E.D. Cal. 2009) (quoting Mendoza v. City of Los Angeles, 66 Cal. App. 4th 1333, 1339, 78 Cal. Rptr. 2d 525 (1998)). Mountjoy v. Bank of Am. N.A., No. 2:15-cv-02204-TLN-DB, 2018 U.S. Dist. LEXIS 3216, at *28 (E.D. Cal. January 8, 2018).

152.    Here, in 1994 Petty accepted a plea deal after savagely raping Plaintiff. As part of that plea deal, Petty was prohibited from directly or indirectly contacting Plaintiff. The purpose of that plea agreement provision is to protect Plaintiff from experiencing a further injury that direct or indirect contact from Petty may cause. As a result of this agreement, Petty assumed a duty to prevent Plaintiff from experiencing any such harm. On multiple occasions, Petty negligently violated the duty he owed Plaintiff.

153.    Petty's actions endangered Plaintiff's safety and caused her to fear for her and her family's safety.

154.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

20

## COUNT V
## Against Petty and Defendant Minaj
## Harassment and Witness Intimidation[6]
## (California and Georgia)

155.         Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

156.    Code Civ. Proc., § 527.6, defines "harassment" as follows: "harassment" is unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. Under § 527.6, subd. (b), the course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and cause substantial emotional distress to the Plaintiff. Krell v. Gray, 126 Cal. App. 4th 1208.

157.    Regarding Georgia's harassment statute, Petty and Defendant Minaj directed their tortious activities at Plaintiff. At the same time, Plaintiff was a resident of the state of Georgia. Plaintiff felt the impact of Defendant's actions in the state of Georgia. Defendants executed their harassing communication directly (Defendant Minaj) and indirectly (both Defendant's) through their intermediaries.

158.         As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

159.    In March 2020, in violation of his 1994 plea deal, Petty and Defendant Minaj intentionally and repeatedly harassed and contacted Plaintiff through their intermediaries. Defendant and Defendant Minaj engaged in courses of conduct, which alarmed and seriously annoyed Plaintiff and served no legitimate purpose.

160.    Defendants attempted to compel Plaintiff not to communicate truthful information

---

[6] There is no civil cause of action for witness intimidation. It is mentioned here to reference the intentions of Defendants.

21

regarding Petty's conduct[7] and recant her statement through intermediaries. Defendants created fear of physical injury by finding Plaintiff's whereabouts after Plaintiff moved several times. Defendant's associates approached Plaintiff's family members in New York; approached Plaintiff's twenty-two-year-old Daughter in Georgia; and approached Plaintiff herself.

161.  In summary, Defendants engaged in constant phone calls, resident pop-ups, family member reach outs, unsolicited contacts, bribing, and attempted coercion. Defendants knew or reasonably should have known that such communication would cause Plaintiff to fear harm to Plaintiff's physical safety and property and a member of Plaintiff's family.

162.  As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

## COUNT VI
### Against Defendant Minaj
### Aiding and Abetting (California and Georgia)

163.  Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

164.  In California, liability for aiding and abetting the commission of an intentional tort may be imposed upon a person who "(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's conduct, separately considered, constitutes a breach of duty to the third person." Neilson v. Union Bank of California, N.A., 290 F.Supp.2d 1101, 1118 (2003) quoting Saunders v. Superior Court, 27

---

[7] Conduct which he admitted to doing within hours of raping Plaintiff and conduct which he admitted to in open Court which served as the basis of his plea deal and reduced jail sentence. Plaintiff recanting her rape claim would not prevent Petty from registering as a sex offender for a crime he willingly admitted to committing. Therefore, Defendant's harassment of Plaintiff served no legitimate purpose.

22

Cal.App.4th 832, 846, 33 Cal. Rptr. 2d 438 (1994). "[W]hile aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in a tortious activity to assist another in performing a wrongful act." Howard v. Superior Court, 2 Cal.App.4th 745, 749, 3 Cal. Rptr. 2d 575 (1992). "[L]iability [for aiding and abetting] attaches because the aider and abettor behave in a manner that enables the primary violator to commit the underlying tort." Neilson, 290 F.Supp.2d at 1134.

165.    Similarly, the eleventh circuit held, "A defendant is liable for aiding and abetting a tortious act if the Defendant: (a) does a tortious act in concert with the other or under a common design with him; or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself; or (c) gives substantial assistance to the other in accomplishing a tortious result and his conduct, separately considered, constitutes a breach of duty to the third person. Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex.Brown, 619 F. App'x 923, 924 (11th Cir. 2015).

166.    Defendant Minaj knew that Plaintiff possessed information relating to a criminal occurrence.  Here, her rape by Defendant Minaj's spouse Petty.  Defendant Minaj knew that Petty was required to register as a sex offender in the state of California.  Defendant Minaj knew or should have known that Petty's 1994 plea deal prevented him from directly or indirectly communicating with Plaintiff.

167.    Despite this, Defendant Minaj engaged in acts of bribery, harassment, stalking, and intimidation by calling Plaintiff and instructing her attorneys, associates, and affiliates to stalk, intimidate, harass, and bribe Plaintiff into recanting her 1994 rape charge against Petty.  As previously stated, Defendant Minaj's actions served no legitimate purpose other than to aide her husband's acts of harassment, stalking, bribery, and witness intimidation.

168.    Additionally, Defendant Minaj created fear of physical injury by finding Plaintiff's whereabouts after Plaintiff moved and changed her phone number several times.  Defendant Minaj's associates approached Plaintiff's family members in New York, approached Plaintiff's twenty-two-year-old Daughter in Georgia, and approached Plaintiff herself.

23

169.    In summary, Defendant Minaj engaged in constant phone calls, address pop-ups, family member reach outs, unsolicited contacts, bribing, and attempted coercion.

170.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life.  Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

<u>COUNT VII</u>
<u>Against Defendant Minaj and Petty</u>
<u>Intentional Infliction of Emotional Distress</u>
<u>(California and Georgia)</u>

171.    Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

172.    In California, to state a cause of action for intentional infliction of emotional distress, a plaintiff must show (1) outrageous conduct by the Defendant; (2) the Defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the Plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the Defendant's outrageous conduct." '"Conduct, to be '"outrageous'" must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." <u>Yau v. Allen</u>, 229 Cal. App. 4th 144, 160, 176 Cal. Rptr. 3d 824, 836 (2014).

173.    In Georgia, a claim of intentional infliction of emotional distress requires proof of the following elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe." <u>Moore</u>, 238 Ga. App. at 377.  The standard for establishing an intentional infliction of emotional distress claim is very high.  The burden on Plaintiff to prove such a claim is stringent. <u>Humphrey v. PennyMac Loan Corp</u>., No. 4:16-CV-00043-HLM-WEJ, 2016 WL 11573629, at *6 (N.D. Ga. May 2, 2016), *adopted by* 2016 U.S. Dist. LEXIS 196711, 2016 WL 11573953, at *1 (N.D.

Ga. May 20, 2016). <u>Futrell v. Southeastrans, Inc.</u>, No. 1:20-cv-04674-WMR-RDC, 2021 U.S. Dist. LEXIS 117597, at *11 (N.D. Ga. April 1, 2021)

174.    In violation of California and Georgia Law, Defendant Minaj and Petty have satisfied the elements of intentional infliction of emotional distress. Defendants were residents of the state of California when they engaged in their tortious and criminal acts. Furthermore, Defendants aimed and directed their tortious and criminal acts towards Plaintiff, a resident of the State of Georgia at the time.

175.    In summary, Defendant's Minaj and Petty's intentional conduct included, but was not limited to:

    i.    Bribery of Plaintiff by sending their associate Black, to Plaintiff's residents with $20,000.00 and offering to have Defendant Minaj record a birthday video for Plaintiff's daughter,

    ii.    Bribery of Plaintiff by approaching the Plaintiff's family members in New York, offering $500,000.00 in exchange for Plaintiff recanting her 1994 rape claim against Defendant,

    iii.    Stalking and Harassing Plaintiff's twenty-two-year-old daughter while her daughter was out with friends in Georgia,

    iv.    Stalking and Harassing Plaintiff by calling and showing up at Plaintiff's home after Plaintiff changed her phone number and residents on multiple occasions,

    v.    Intimidating Plaintiff's family in New York with threats of physical bodily harm if Plaintiff did not recant her 1994 rape claim. These threats resulted in Plaintiff's moving out of Georgia to a remote location in the State of Florida, and

    vi.    Through their associate Black, they are threatening to kill Plaintiff on social media.

176.    Defendant's actions were intentional, and the conduct was extreme and outrageous. Undoubtedly there was a clear causal connection between the conduct and Plaintiff's emotional distress. Plaintiff's emotional distress is persistent and severe. So much so, Plaintiff has not worked since having to move over three times within twelve months as she has been in fear for her life and safety.

25

177.    As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, loss of enjoying life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life.

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, as follows:

a.  For past, present, and future general damages in an amount to be determined at trial;

b.  For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

c.  Any appropriate statutory damages;

d.  For costs of suit;

e.  For interest as allowed by law;

f.  For attorney's fees;

g.  The cause of action authorized any appropriate punitive or exemplary damages against Defendants Petty and Minaj;

h.  For such other and further relief as the Court may deem proper.

Dated: September 2, 2021

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.
T.A. Blackburn Law, PLLC
1242 E. 80th Street, 3rd Floor
Brooklyn, NY 11236
Tel: 347-342-7432
TBlackburn@TABlackburnlaw.com

26

# EXHIBIT # A



# EXHIBIT # B

Be safe  out here lol

No Friends (feat. Yo Gotti...
EST Gee

2,020 views · 114 comments

Browse IGTV