```
 1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF NEW YORK

 3    JENNIFER HOUGH,                .   Docket No.
                                     .   1:21-cv-04568-ENV-JRC
 4        Plaintiff,                 .
                                     .
 5          v.                       .   Brooklyn, New York
                                     .   Friday, April 29, 2022
 6    ONIKA TANYA MARAJ, ET AL.,     .   9:08 a.m.
                                     .
 7        Defendants.                .
      . . . . . . . . . . . . . . .  .
 8

 9              TRANSCRIPT OF PRE-MOTION CONFERENCE
                 BEFORE THE HONORABLE JAMES R. CHO
10                 UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiff:        T. A. Blackburn Law, PLLC.
                               TYRONE ANTHONY BLACKBURN, ESQ.
13                             1242 East 80th Street
                               Suite 3rd Floor
14                             Brooklyn, New York  11236
                               347-342-7432
15
     For the Defendant:        Judd Burstein, PC
16                             JUDD BURSTEIN, ESQ.
                               260 Madison Avenue, 15th Floor
17                             New York, New York  10016
                               212-974-2400
18
     For the Non-Party         Law Offices of Susan G. Kellman
19   Ciardone Franklin Gordon: and Associates
                               SUSAN  G. KELLMAN, ESQ.
20                             25 8th Avenue
                               Brooklyn, New York  11217
21                             718-783-8200

22
     Transcription Service:    Opti-Script, Inc.
23                             P.O. Box 77
                               Winfield, PA 17889
24                             800-494-7500

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
```

1                P R O C E E D I N G S

2            THE CLERK:  Civil cause for a motion hearing, case

3    number 21-cv-4568, Hough v. Maraj, et al.

4            Counsel, please state your name for the record,

5    beginning with the Plaintiff.

6            MR. BLACKBURN:  Tyrone Anthony Blackburn, T.A.

7    Blackburn Law, LLC, Brooklyn, New York.

8            THE COURT:  Good morning.

9            MR. BLACKBURN:  Do you need the address?

10           THE COURT:  No.

11           MR. BURSTEIN:  For the Defendant Onika Maraj, Judd

12   Burstein, Judd Burstein, PC.

13           MS. KELLMAN:  Susan Kellman, Your Honor.  I'm here

14   at Your Honor's pleasure or invitation, and I represent

15   Ciardone Franklin Gordon.

16           THE COURT:  All right.  Good morning.  For purposes

17   today, we'll refer to her as Mrs. Gordon, okay?

18           MS. KELLMAN:  Thank you.

19           THE COURT:  Ms. Kellman, if you don't mind, can you

20   give us your address for the record just so we have it?

21           MS. KELLMAN:  25 Eighth Avenue, Brooklyn, 11217.

22           THE COURT:  All right.  Good morning, everyone.

23   I've reviewed all the submissions that the parties have filed

24   with the Court.

25           We are here because counsel for Maraj filed an

1  emergency petition for a court conference in connection with
2  an anticipated sur-reply that the Plaintiff was contemplating
3  filing.  I've reviewed that submission, along with your
4  response to that, Mr. Blackburn, as well.
5            All right.  Given that we're in a public
6  proceeding, if there's any discussion that might be
7  considered private, please let me know.  We can always
8  sidebar or go off the record.
9            But Mr. Burstein, do you want to be heard on your
10 petition?
11           MR. BURSTEIN:  Yes.
12           THE COURT:  Go ahead.
13           MR. BURSTEIN:  Your Honor, I find myself in sort of
14 an unusual situation because, all things being equal, if this
15 were another case, I would invite the sur-reply because it's
16 based upon a submission that is materially inconsistent with
17 Mr. Blackburn's initial response.
18           In his answering papers, he said that he only
19 learned about Mr. Gordon supposedly writing that YouTube post
20 later whereas he then, in an effort to coerce Mr. Gordon or
21 whatever into withdrawing his affidavit, he produced a text
22 which shows that he knew about -- you don't have that, Your
23 Honor.  I have a copy if you'd like to see it.
24           But he produced a text, which shows that he knew at
25 the time that the post was submitted that Mr. Gordon claimed

1  either he wrote it or his wife -- he wrote it and his wife
2  posted it.  I don't know what the facts are.
3       But my concern is the following.  On the one hand,
4  as a strictly legal matter, I don't know that there's any
5  basis for a sur-reply because, you know, the notion that Mr.
6  Gordon [sic] wants to respond to Mr. and Mrs. Gordon's
7  affidavits is not a basis for a sur-reply because he had all
8  of the evidence that he has now, and he just chose not to
9  present it.
10      So that somebody comes in and denies these
11 allegations is not a basis for a sur-reply.  He chose not to
12 put it in.  So on the one hand, he's not entitled to a
13 sur-reply.
14      But my big concern here is really twofold.  This
15 has been an extraordinarily high profile case.  Frankly, I
16 knew who Nicki Minaj was by the name before I started this
17 case.  But in 40 years, I've never seen anything like this in
18 terms of getting 15 emails a day sometimes from her
19 supporters or detractors.
20      And every single time that Mr. Gordon -- I mean,
21 Mr. Blackburn has made, you know, an outrageous allegation
22 such as she's a member of a gang but more importantly, the
23 more recent claim that because her brother was convicted of
24 sex with a minor that she has a reputation for supporting,
25 you know, child sex abusers.  Mr. Blackburn knows that that's

1    going to result in media attention, which is exactly what
2    happened.  It happened to me also.  I'm not quite as
3    concerned about it, but it nonetheless happened to me with
4    this whole notion about he says I had a sick obsession with
5    Mr. Gordon's wife.
6         And now in his new papers he's suggesting something
7    that -- I've been practicing more than 40 years.  No one has
8    ever accused me of colluding with an opponent's lawyer to the
9    detriment of that lawyer's -- the other lawyer's client.
10   That's an extraordinarily outrageous accusation to make
11   against another lawyer.
12        That's one concern I have, but I wouldn't
13   think -- I'm not asking him not -- I'm not arguing he
14   shouldn't file a sur-reply because it will harm my
15   reputation.  I think it's unfair to unnecessarily keep this
16   case in the media by another filing that's entirely
17   outrageous.  And it's just ugly.
18        So on another level, I have very good reasons based
19   upon what I know to be unhappy with Mr. Gordon.  But I don't
20   think that -- on sort of a human level, it's just wrong to do
21   this when it's completely unnecessary.  If you read my
22   papers, Your Honor, I didn't vouch for the truth of what Mr.
23   Gordon and his wife said.  I simply said -- I gave them a
24   forum because I think it was unfair.  But I don't know the
25   truth.  And what is untrue is that I colluded with him.

1                 And I think it's particularly outrageous about Mrs.
2    Gordon because, you know, Mr. Blackburn -- and Ms. Kellman
3    can talk more to this.  Mr. Blackburn went to a dinner.
4    They're apparently friends with Mrs. Gordon.  Went to a
5    dinner with her to -- apparently friends.  He brought her
6    roses or whatever and secretly recorded her.  And that's what
7    he wants to make his motion on.
8                 And I've done the research.  It's a little
9    open -- there are conflicting bar opinions on whether it's
10   appropriate for a lawyer to secretly record a conversation.
11   But the one unquestionable rule is that it is improper when
12   the recording violates another ethical rule.  And here it
13   violates 8.4.  You don't go to dinner with someone as a
14   lawyer with a friend and turn around and not tell her that
15   you're recording her.
16                So for all of these reasons -- the reason why I ask
17   for an in camera hearing because I just think it's so ugly
18   and so unfair and so unnecessary that I can't even understand
19   what the relevance of it is.  Frankly, I'm outraged about it.
20   But I wanted to do this in a situation where Mr. Blackburn
21   was not going to be able to file a motion for permission to
22   file a sur-reply where he put in everything into the public
23   record that he would put in a motion for a sur-reply.  And it
24   would have the same damage to my client and to the Gordons.
25                That's why I wanted the conference so that I

1  wouldn't have all of this polluting the public record because
2  any time there's a substantive filing in this case, it's all
3  over social media and also in, you know, major media outlets.
4  So that's why I asked for the conference.  I don't understand
5  why there's a need for a sur-reply, but I also felt that it
6  was important to alert the Court in a setting where I didn't
7  put it in writing why it was particularly outrageous.
8           I don't know if Ms. Kellman has anything to say,
9  but that was my reason for asking for the conference.
10          THE COURT:  Okay.  Why don't I hear from Mr.
11 Blackburn first.  Mr. Blackburn, do you want to be heard?
12          MR. BLACKBURN:  Your Honor, may it please the
13 Court.  The purpose that the motion was filed by Mr. Burstein
14 was to publicly embarrass me.  That was the sole purpose of
15 it.
16          Of the 29 pages for the motion for sanctions, 25 of
17 those pages was just outright attacks against myself, against
18 my record, against my litigation history.  And then he puts
19 forth two arguments where he talks about I should be
20 sanctioned.  Why?  One, because the Court -- because I filed
21 a default judgment against Ms. Maraj, which the Court granted
22 me permission to do.  And that I should also be sanctioned
23 due to the fact that I wrote the letter that I withdrew in
24 response to his your wife's email.
25          He raised a lot of things.  He talks about the text

1  that Mr. Gordon sent in November of last year when he
2  admitted to being the author of the YouTube post which
3  triggered the your wife email from Mr. Burstein.  I did not
4  remember that I had that.  It was in November or December.
5          So in January, I traveled to Uganda.  I was gone
6  for a while.  From the date that he sent me that text up
7  until January when I withdrew the letter that I wrote because
8  of the fact that I had learned again through conversations
9  with Ciardone and through Steven that he had -- actually was
10 the one that wrote and published the YouTube comment.
11         I think it was maybe last week when I asked -- I
12 informed Mr. Burstein because the judge required us first to
13 meet and confer to get the scheduling.  And I said to him, I
14 said, you know, Steven lied in his declaration.  He lied in
15 his declaration.  And Ciardone lied in her declaration as
16 well.
17         And I did not ask Ciardone to go to dinner on the
18 10th of March.  Ciardone asked me to go to dinner on the 10th
19 of March.  She did so in an Instagram message where she
20 extended an invitation for us to go to dinner at 5:30 on the
21 10th at Maya in Long Island City because she wanted to
22 explain to me what Mr. Gordon's behavior was and why he acted
23 that way because for the life of me I could not figure out
24 how an attorney could usurp his ethical duties of obligation
25 to his client and have conversations with opposing counsel

1  behind the back of lead counsel -- that's what he calls
2  me -- and the client.  He never disclosed any of the
3  information that he shared with Mr. Burstein.
4         He has not given me any of the emails that he gave
5  to Mr. Burstein.  I have a client who is having nervous
6  mental breakdowns as a result of Steven's actions.  I could
7  read you a text message she sent me the other day.  She goes,
8  "I'm sick of Steve, and I hate that he was ever involved in
9  my case.  How would these people know who have been harassing
10 me for more than a year if he didn't tell him?"
11        And what is she referring to?  A YouTube post where
12 Steven purportedly shared a text conversation with myself and
13 Jennifer to this YouTube blogger.  And now this blogger is
14 talking about attorney-client privileged information that
15 Jennifer shared with him.  Okay?
16        That's just a piece of the carnage that he's
17 created in this case when he was here for a limited time.
18 And then he filed a declaration where he's lying.  He wrote
19 the post.  And I have a text that showed that he wrote it.
20 And he said he did it.  He's literally lying to the Court.
21        And then he forced his wife -- and I don't think
22 she did it because here's how I know Ciardone did not
23 voluntarily write this declaration.  I went to dinner with
24 her, and then she was my date to a gala on March 31st.  It
25 wasn't until Judd was preparing -- Mr. Burstein, I should

1 say, was preparing to file his -- to file the motion for
2 sanctions that sent me a text saying that she was crying all
3 day because Steven had threatened her to use the declaration
4 against her in a divorce to get money from her. Okay?
5       The purpose of the dinner was for her to provide me
6 to context surrounding Steven's actions. That's why we went
7 to the dinner. Okay? And the reason why I recorded the
8 dinner, as I record other things, is because I have ADD and I
9 can't remember things. I'm on medication. So it's for me to
10 keep notes of what it is that was said to me unless this is,
11 like, a court proceeding where, you know, the clerk will then
12 keep note of what transpired instead of the proceedings. But
13 that's why I do it.
14       Ciardone knew that her information was going to be
15 used. There was no mystery. And the fact that she said that
16 she didn't tell me that Steven has a drug addiction, where
17 would I get that from? She not only told me he has a drug
18 addiction -- and this could be private. I don't want, you
19 know -- if this is public, I would say we should go off the
20 record.
21       THE COURT: I don't need details.
22       MR. BLACKBURN: Okay.
23       THE COURT: Go ahead.
24       MR. BLACKBURN: But she told me a lot of things,
25 including where he goes to get his stuff from, okay, as well

1  as stories and examples of his actions and how his addiction
2  has impacted his life and how, in her words, as she said,
3  Steve has issues with not making good judgment calls and his
4  impulsivity.  He learns the hard way.  Okay?
5           So I do think it's important for me to correct the
6  record.  Now, here's what I propose.  If Mr. Burstein does
7  not want me to file a sur-reply, I don't have to file the
8  sur-reply.  But my proposal is this, and that is if he wants
9  to refile his motion for sanctions against me and talk about
10 the default motion which he claims I should be sanctioned for
11 and that he remove the 25 pages' worth of baseless attacks,
12 personal attacks against me, I have no problem.
13          Because the only reason why I responded the way
14 that I did was because I went through everything that he said
15 about me.  I put a response in there.  If you compare with
16 what he wrote and compare what I replied to, I literally
17 wrote section heading by section heading, and I responded to
18 everything that he said about me.  It wasn't until the last
19 four pages that he even made the argument as to why I should
20 be sanctioned.
21          So if he wants to spare these young lawyers as he
22 claims -- and I'm a young lawyer myself, but he doesn't care
23 about me.  But if he wants to spare these two young lawyers,
24 what I'm proposing is that he could refile his sanction, talk
25 about the default motion.  I will reply in opposition to the

1    default motion charged, which is what he claimed against me.
2    And there would be no need for me to explain Mr.
3    Gordon's -- Mr. Burstein's your wife email, which was an
4    orchestration of what Steven Gordon did.  There would be no
5    need for me to reply and to respond to that.
6              MR. BURSTEIN:  And may I briefly respond, Your
7    Honor?
8              THE COURT:  Mr. Blackburn, anything else?
9              MR. BLACKBURN:  No.  I'm just greatly frustrated
10   because this has brought a lot of unnecessary drama and pain
11   to my client that she was not looking for.  It is bad enough
12   she was raped as a child by Ms. Maraj's husband.  And then to
13   be attacked by Ms. Maraj and her fans online also shouldn't
14   be -- Mr. Burstein says that I should have never raised the
15   fact that Ms. Maraj's brother -- that Ms. Maraj supported her
16   brother.  But if you google it, you'll see that it's
17   everywhere.  And it wasn't just only her brother.
18             And I put it in the footnote as an example of a
19   pattern and practice of her behavior of attacking victims.
20   That is the truth.  That is not a lie.  It is online.  She's
21   done it consistently throughout her career.  If you want to
22   look at it, you can go online and google it, and you'll find
23   it.  I have other examples.  It's not just her brother.  Her
24   ex-boyfriend posted a tweet when he was in the room and he
25   heard Nicki Minaj and her mother conspiring against a child.

1    So it's not something that I've made up out of whole cloth.
2    This is a thing that you can google and find.
3              THE COURT:  Okay.  Mr. Burstein, go ahead.
4              MR. BURSTEIN:  I have a few things to say.  First
5    of all, Mr. Blackburn did not retract the statement.  He only
6    said that he realized later on that Mr. Gordon had actually
7    drafted the statement.  This is what he wrote in his papers.
8              At the time Mr. Blackburn was not aware that Mr.
9    Gordon had orchestrated the YouTube comment post and possibly
10   the email sent.  Except that Mr. Blackburn has given me a
11   text which says he knew it at exactly that time.  He knew at
12   the time it was posted.  And now he's just recently put in
13   something that's unequivocally false.
14             But the more important thing is I deal with the
15   papers that are presented to me.  Mr. Blackburn made a claim
16   about my client being a supporter of -- has a reputation for
17   being a supporter of child predators.  He put in one
18   supporting article, and I'm supposed to assume that he has
19   additional evidence.
20             But all I'm hearing basically is he doesn't like my
21   motion.  He had an opportunity to respond.  I replied.  And
22   he's mad at Mr. Gordon.  And Mr. Gordon has treated his
23   client unfairly.  That's between his client and Mr. Gordon or
24   him and Mr. Gordon.  Why is it polluting the record in this
25   case?  There is nothing -- and the notion that Mr. Blackburn

1  will trade my basically withdrawing my motion and limiting it
2  so that he doesn't have to file a sur-reply is in itself
3  outrageous.  I'm happy to rely on my papers.  I think
4  everything in my papers is appropriate.  Maybe I'll be wrong;
5  maybe I'll be right.  But I can't accept a trade.  I think
6  that's improper.
7           If Mr. Blackburn is unhappy with the accusations
8  I've made in my papers, he had a full opportunity to respond.
9  I replied to what he wrote.  And if he's unhappy, he's
10 unhappy.  It doesn't mean that he gets another chance to
11 pollute the record for no reason.  If you heard everything he
12 had to say, it has to do with him being upset about what Mr.
13 Gordon said to his client, what his conversation was with
14 Mrs. Gordon.
15          By the way, that still doesn't change the fact that
16 he didn't disclose to her that he was recording her.  And
17 under those circumstances, I think it was plainly a violation
18 of 8.4.  And the notion that he needs to record things
19 because he has ADHD -- so do I, but I learned about taking
20 notes.  But more to the point, if that's the reason he's
21 recording, it would have been disclosed.
22          But again, I'm in this situation where all of this
23 irrelevant.  It's polluting the record.  I'm going to end up
24 with another round of stories, which is remarkably unfair
25 about my client.  He's going to say things which will

1  necessitate a reply to me to the extent that it deals with me
2  or he now wants to put in more evidence that he has about Ms.
3  Maraj's supposed support of child predators.  It's just
4  wrong.  It's just an abuse of the system.  It's polluting the
5  record for no reason.
6         What I've heard now, it makes it even more clear
7  that this is improper.  This is not the forum for Mr.
8  Blackburn to air his concerns and his anger and his distaste
9  for what Mr. Gordon did and his unhappiness with Mrs. Gordon.
10 It's just not the right forum.
11        THE COURT:  Okay.  Ms. Kellman, do you want to be
12 heard?  Go ahead, Ms. Kellman.
13        MS. KELLMAN:  Your Honor, I don't have that much to
14 add, but it just seems to me that even the mention of my
15 client or any mention of my client in this is -- in this
16 overall litigation just seems a complete distraction.  It's
17 not relevant.  And it's just inflammatory for no apparent
18 reason.
19        They have their issues, clearly, but I just don't
20 see how my client's role in this does anything other than
21 damage her reputation for no apparent reason.  It's
22 ultimately not something that will impact the outcome of this
23 litigation one way or the other.  And I would ask that
24 everything in the record with respect to my client be
25 removed.

```
 1                THE COURT:  Okay.  Mr. Blackburn, do you want to be
 2   heard?
 3                MR. BLACKBURN:  So I just want to address some
 4   points that Mr. Burstein's raised.  He talks about me having
 5   this thing against Mr. Gordon.  The only reason why I had to
 6   even mention Mr. Gordon was because I have to explain the
 7   your wife email.  What else was I going to say other than the
 8   fact that this is what I learned?
 9                Ms. Franklin and her mother since January 26th has
10   been going to Mr. Gordon unsuccessfully to try to get him to
11   turn over all documentation he's shared with Mr. Burstein,
12   text messages, emails, phone records, and details of phone
13   conversations.  I've waited for months to get this
14   information from him.  He's not given it to me.
15                And Mrs. Gordon provided me with the context as to
16   why she believes it is so.  And that is what I shared with
17   the Court.  And she was well aware of what it is that I was
18   going to share.  And like I said before, the only reason why
19   she had a problem with it was because he threatened her.  You
20   can see that in the text message.  That's the first thing.
21                Second thing.  Mr. Burstein wants to pretend to be
22   so caring about the media coverage on this thing.  But then
23   he leaks an email that he sent to the lawyers to the press.
24   He did that.  This wasn't something that I did.  It wasn't
25   something that was filed in the court records.  But it was
```

1   something that he sent to TMZ, which TMZ reported on, where
2   he called me a bottom feeder, okay, in an email to me.
3           So he talks about civility and talks about us not
4   polluting the record and all that stuff, but he's actually
5   doing it without information that was even filed on the
6   docket.  He literally sent an email to TMZ referring to me as
7   a bottom feeder.
8           MR. BURSTEIN:  Except that I swore in my
9   declaration --
10          THE COURT:  Mr. Burstein, one at a time.
11          MR. BURSTEIN:  -- that I didn't do it.
12          THE COURT:  One at a time.
13          Are you done --
14          MR. BLACKBURN:  No.
15          THE COURT:  -- Mr. Blackburn?
16          MR. BLACKBURN:  No.
17          THE COURT:  Go ahead.
18          MR. BLACKBURN:  So like I said before, Your Honor,
19  everything that I responded to and everything that I wrote is
20  a direct response to what was filed, a direct response to
21  what was filed.  There's no way that I could have
22  explained -- and I was looking for it for a while -- no way
23  that I could explain what it was that -- what led Steven to
24  do what Steven did, which resulted in the your wife's email.
25  Right?  That was a piece of it.

1                   The portion of his motion where he talks about me
2     filing the default judgment is baseless because the Court
3     granted me permission to do so.
4                   But the heart of it is talking about this your wife
5     email, which, again, Steven -- again, back to Steven -- is
6     the orchestrator of all these things.  Like I said before, I
7     did not remember that I had the text in November because if I
8     did I would have included it.  Surely I would have included
9     it in my letter that I wrote.  Well, I wouldn't have even
10    wrote the letter if I had remembered that I had the text
11    messages.  And Steven called me and asked me to write the
12    letter.
13                  And Ciardone said to me on Instagram, I don't know
14    why he did that.  I don't know why he even asked you to
15    respond to Judd's your wife email in that letter.  I have a
16    text where Steven is asking me to write this.  So again, he's
17    lying again on the record.  In this declaration he lied
18    again.
19                  THE COURT:  Okay.  Question for you, Mr. Blackburn.
20    You had mentioned at a prior conference that you may file a
21    new lawsuit in California; is that correct?
22                  MR. BLACKBURN:  Yes.  Yes, sir.
23                  THE COURT:  What's the status of that?  Has that
24    been filed or --
25                  MR. BLACKBURN:  So right now, we're working with

1  California counsel.  And they're going through the statutes
2  to see which causes of action -- the complaint's already
3  written, by the way.  It's just a matter of figuring out
4  which causes of action is going to be brought in California.
5          THE COURT:  Okay.  Now, have there been any
6  settlement discussions between the two of you recently?
7          MR. BURSTEIN:  No.
8          THE COURT:  Okay.  All right.  What I want to do is
9  talk to the parties privately.  All right?  I want to confirm
10 that these proceedings are not being recorded.  Okay?  And if
11 they are, stop any recordings.  We will stop our
12 transcription as well at this time.
13      (Recess from 9:34 a.m. until 10:21 a.m.)
14         THE CLERK:  We're back on the record for
15 21-cv-4568, Hough versus Maraj, et al.
16         THE COURT:  All right.  Back on the record.  We
17 held some off-the-record discussions regarding the pending
18 motions and briefly settlement.
19         What we've agreed is that the Defendants will
20 withdraw the two declarations from Mr. and Mrs. Gordon that
21 were included with the reply brief.  So go ahead and file a
22 letter to that effect on the docket within the next seven
23 days.
24         And that Mr. Blackburn is not going to file a
25 sur-reply at this time.  Okay?

1      I believe that addresses the issues that we're here
2 to address today, correct, Mr. Burstein, Mr. Blackburn?
3      MR. BLACKBURN:  Yes, Your Honor.
4      THE COURT:  Okay.  With that, we're adjourned.
5 Thank you, everyone.
6      (Proceedings adjourned at 10:22 am)
7
8                    TRANSCRIBER'S CERTIFICATE
9      I certify that the foregoing is a correct
10 transcript from the electronic sound recording of the
11 proceedings in the above-entitled matter.
12
13                                         May 4, 2022
14
15 *Carrie Clouse* _____    _____
16 Carrie Clouse, CET-1207                           DATE
17 Legal Transcriber
18
19
20
21
22
23
24
25