**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JENNIFER HOUGH,
                              Plaintiff,

        -against

KENNETH PETTY, AKA ("ZOO"),
an individual
                              Defendants.

**SECOND AMENDED COMPLAINT**
Civil Action No. 21-4568

**JURY DEMANDED**

        Plaintiff Jennifer Hough ("Hough" or "Plaintiff") brings claims for intentional infliction of emotional distress, negligent infliction of emotional distress, rape, attempted rape, assault, battery, and sexual assault against Defendant Kenneth Petty ("Petty" or "Defendant Petty") and now alleges as follows:

1. Plaintiff's claims include but are not limited to intentional infliction of emotional distress, negligent infliction of emotional distress, rape, attempted rape, assault, battery, and sexual assault by Defendant Petty.

2. Plaintiff seeks to hold Defendant Petty liable under various legal doctrines, including, without limitation, strict liability and other grounds.

## JURISDICTION AND VENUE

3. This Court has personal jurisdiction over Defendant Petty under and consistent with the Constitutional requirements of Due Process in that Defendant Petty, acting directly or through his agents, intermediaries, or apparent agents, committed one or more of the following:

    i.   The transaction of any business within the state;

    ii.  The making of any contract within the state;

    iii. The commission of a tortious act within this district[1]; and

    iv.  The ownership, use, or possession of any real estate situated within this state.

---

[1] Defendant raped Plaintiff in the borough of Queens, which falls within the EDNY.

4. The Court has supplemental jurisdiction over Plaintiff's related claims under state and local law under 28 USC § 1367(a).

5. Plaintiff is a resident of North Carolina, while Defendant is a citizen of and domiciled in California.

6. Plaintiff felt the bulk of Defendant Petty's action in New York.

7. Damages far exceed the $75,000.00 threshold for diversity jurisdiction.

## PARTIES

8. Plaintiff is a resident of North Carolina and was a resident of the State of New York at sixteen years old when raped by Petty. Plaintiff is currently 44 years old.

9. Petty is a rapist, a registered sex offender, a level-two sex offender, and pled guilty to First Degree Manslaughter following gunfire that resulted in the unnecessary death of a young man. According to Petty's sex offender registry, he was born on April 7, 1978, and is currently 45.

## FACTS COMMON TO ALL CAUSES OF ACTION

10. Plaintiff knew Petty from their childhood neighborhood of Jamaica, Queens, New York. Plaintiff was never in a relationship with Petty and knew him from the neighborhood.

11. In violation of his 1994 plea deal, Petty failed to register as a sex offender in California. The United States Attorney's Office for the Central District of California prosecuted Petty for failing to register as a sex offender[2]. Petty has since taken a plea deal for failing to register as a sex offender[3].

12. In violation of his 1994 plea deal, Petty, directly and indirectly, intimidated Plaintiff not to speak out concerning the rape she experienced at the hands of Petty.

13. In violation of his 1994 plea deal, Petty, directly and indirectly, threatened Plaintiff not to speak out concerning the rape she experienced at the hands of Petty.

14. In violation of his 1994 plea deal, Petty, directly and indirectly, harassed Plaintiff not to speak out concerning the rape she experienced at the hands of Petty.

---

[2] Case # 20-CR-00108-MWF.
[3] As of the date of this document, Petty was sentenced to one year of home confinement plus probation. Upon information and belief, Defendant Petty has satisfied his home confinement.

15. In violation of his 1994 plea deal, Petty, directly and indirectly, reached out to Plaintiff's family members to ensure Plaintiff would not speak out concerning the rape she experienced at the hands of Petty.

16. As a direct result of the actions of Defendant Petty, Plaintiff has been traumatized her entire life.

17. Plaintiff has never felt safe since being raped by Petty.

18. Plaintiff has never felt safe since Petty admitted to attempting to Rape Plaintiff.

19. Plaintiff has moved to multiple states to avoid intimidation and harassment by Defendant Petty and their allies, legal teams, and fans.

## TIMELINESS UNDER THE CHILD VICTIMS ACT[4]

---

[4] The opening paragraph of section 208 of the civil practice law and rules is designated subdivision (a), and a new subdivision (b) is added to read as follows:

(b) Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or particular proceeding, with respect to all civil claims or causes of action brought by any person for physical, psychological or other injury or condition suffered by such person as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against such person who was less than eighteen years of age, incest as defined in section 255.27, 255.26 or 255.25 of the penal law committed against such person who was less than eighteen years of age, or the use of such person in a sexual performance as defined in section 263.05 of the penal law, or a predecessor statute that prohibited such conduct at the time of the act, which conduct was committed against such person who was less than eighteen years of age, such action may be commenced, against any party whose intentional or negligent acts or omissions are alleged to have resulted in the commission of said conduct, on or before the Plaintiff or infant plaintiff reaches the age of fifty-five years. In any such claim or action, in addition to any other defense and an affirmative defense that may be available under the law, rule, or the common law, to the extent that the acts alleged in such action are of the type described in subdivision one of section 130.30 of the penal law or subdivision one of section 130.45 of the penal law, the affirmative defenses set forth, respectively, in the closing paragraph of such sections of the penal law shall apply.

The civil practice law and rules are amended by adding section 214-g to read: § 214-g—certain child sexual abuse cases. Notwithstanding any provision of law which imposes a period of limitation to the contrary and the provisions of any other law pertaining to the filing of a notice of claim or a notice of intention to file a claim as a condition precedent to commencement of an action or particular special proceeding, every civil claim or cause of action brought against any party alleging intentional or negligent acts or omissions by a person for physical, psychological, or other injury or condition suffered as a result of conduct which would constitute a sexual offense as defined in article one hundred thirty of the penal law committed against a child less than eighteen years of age, incest as defined in section 255.27, 255.26 or 255.25 of the penal law committed against a child less than eighteen years of age, or the use of a child in a sexual performance as defined in section 263.05 of the penal law, or a predecessor statute that prohibited such conduct at the time of the act, which conduct was committed against a child less than eighteen years of age, which is barred as of the effective date of this section because the applicable period of limitation has expired, and/or the Plaintiff previously failed to file a notice of claim or a notice of intention to file a claim, is hereby revived, and action thereon may be commenced not earlier than six months after, and not later than one year and six months after the effective date of this section. In any such claim or action: (a) in addition to any other defense and an affirmative defense that may be available under the law, rule, or the common law, to the extent that the acts alleged in such action are of the type described in subdivision one of section 130.30 of the penal law or subdivision one of section 130.45 of the penal law, the affirmative defenses set forth, respectively, in the closing paragraph of such sections of the penal

20. This action is timely because it falls within CPLR 214-g and is brought during the period outlined in that section. The claims brought herein allege intentional and negligent acts and omissions for physical, psychological, and other injury suffered because of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and omissions were committed against Plaintiff when she was less than eighteen years of age.

21. Specifically, the conduct that gives rise to Plaintiff's claims herein would constitute a violation of, among other things, New York Penal Law, 130.35 (rape in the first degree), 130.52 (forcible touching) (collectively, the "Child Sex Crimes").

## FACTUAL ALLEGATIONS

### KENNETH PETTY VIOLENTLY RAPED PLAINTIFF HOUGH

22. September 16, 1994, is a date now burned into Plaintiff's memory and soul forever. Plaintiff, a sixteen-year-old girl, left her grandmother's house in Jamaica, Queens, and was headed to the Q7 MTA bus stop on 145th Street and Rockaway Blvd. to catch the bus for school.

23. Petty was standing at the bus stop when Plaintiff got there.

24. Upon information and belief, Petty was known as a delinquent that opted not to go to school, instead choosing to spend his days scouring the streets of Jamaica Queens.

25. On September 16, 1994, when Plaintiff arrived at the bus stop, she was taken aback at the sight of Petty waiting at the bus stop. Upon information and belief, Petty's custom was to stand outside the store across the street from the bus stop, not the bus stop itself.

26. Plaintiff stood at the bus stop but did not address Petty. Defendant Petty asked Plaintiff, "where are you going" to which Plaintiff responded, "to school, where are you going?" to which Petty answered, "I am going to school also."

27. Plaintiff did not believe him because she knew Petty never went to school, so she responded, "yeah, right."

28. After that brief exchange, Plaintiff turned her back to Petty to look to see if the Q7 bus or a

---

law shall apply; and (b) dismissal of a previous action, ordered before the effective date of this section, because such previous action was time-barred, and for the failure of a party to file a notice of claim or a notice of intention to file a claim, shall not be grounds for dismissal of a revival action under this section.

dollar van[5] was coming.

29. As she turned her back, Petty approached her from behind. Petty grabbed the back of Plaintiff's jacket firmly, pressed what she believed was a gun into her back, and told her to "start walking."

30. Plaintiff tried to turn around, but Petty would not let her go, nor would he take the gun from her back.

31. Plaintiff began pleading for her life;

    i.      "Kenny, where are we going?"

    ii.     "Kenny, please just let me go." Petty did not let her go.

32. Upon information and belief, he had already made up his depraved mind that he would rape Plaintiff.

33. Petty walked Plaintiff to a house around the corner from the bus stop, not letting go of his grip on her clothing and with the gun still pressed firmly into her back.

34. Petty kicked the door to the house open, pushed Plaintiff inside, and walked her upstairs, still at gunpoint.

35. Plaintiff was crying the whole way up the stairs, pleading for her life, absolutely terrified of what will happen to her.

36. Petty brought Plaintiff to his filthy, cluttered, disgusting bedroom.

    i.      Upon information and belief, the attached exhibit are photos of the filthy room where Petty proceeded to rape Plaintiff. This image comes directly from the evidence the Queens District Attorney collected on September 16, 1994. When this evidence was collected, Petty admitted via a video-recorded in-person Interrogation that it was indeed his room in his house. **Exhibit C**.

37. Plaintiff pled to Petty, "what do you want from me?", "Why am I here?"

38. Petty replied as she pled through her tears, only stating, "you know what I want." Plaintiff continues struggling with Petty, fighting for her life to get this rapist off her.

---

[5] A dollar van is a mode of transportation that transports short distances for only a dollar. Plaintiff's school was located twenty city blocks away from the bus stop.

39. Petty held her down with his body weight and used his hands to forcibly rip off her pants, prying them off her small sixteen-year-old frame.

40. Plaintiff was fighting back with all the strength she had. In turn, Plaintiff savagely bit Plaintiff on her face.

    i. Upon information and belief, the attached exhibit is a photo of the bite mark on Plaintiff's face caused because of Defendant Petty. This image comes directly from the evidence the Queens District Attorney collected on September 16, 1994. **Exhibit A**.

41. Then Petty grabs a knife again, presses it into Plaintiff's stomach, causing a small cut, and threatens to use it further.

    i. Upon information and belief, the attached exhibit is a photo of the knife used by Petty. This image comes directly from the evidence the Queens District Attorney collected on September 16, 1994. When this evidence was collected, Petty admitted via a video recorded in person Interrogation that he owned this knife. **Exhibit B**.

42. Petty squeezes Plaintiff's sides to force her to release her pants.

    i. Upon information and belief, the attached exhibit are photos of 16-year-old Plaintiff's bruised sides where Petty violently grabbed her to force her to stop fighting, allowing Petty to pull down her pants and rape Her. These images come directly from the evidence the Queens District Attorney collected on September 16, 1994. **Exhibit D**.

43. Petty then savagely and violently choked Plaintiff leaving fingerprints on Plaintiff's neck.

    i. Upon information and belief, the attached exhibit are photos of 16-year-old Plaintiff's bruised neck, evidencing Petty's fingerprints. These images come directly from the evidence the Queens District Attorney collected on September 16, 1994. **Exhibit E**.

44. After being threatened with a knife cut on her stomach, Plaintiff had no fight. Seeing no escape in sight, Plaintiff did the only thing she could do to save her life: give in and hope her rape would be over quickly.

45. Once Petty got off Plaintiff, he stood in the mirror and beat on his chest, stating, "I am the man, I am the man" repeatedly.

**THE ESCAPE**

46. Plaintiff mustered all her strength and courage to get back up again and asked Petty, "Can I please leave."

47. Plaintiff attempted to walk towards the door and was blocked by Petty, who prevented her from leaving.

48. All Plaintiff could do at this point was to beg and plead to her rapist for her freedom, "please let me go," "I promise I won't say anything," saying anything to get out of that house.

49. Petty is still admiring himself after the violent rape in the mirror and attempts to light a cigarette to celebrate his depravity.

50. Quickly thinking, Plaintiff said, "Let me light it for you," she lit the match and attempted to throw the lit flame toward a roll of toilet paper on the dresser in front of her, hoping to set the toilet paper ablaze. The flame goes out before it reaches the toilet paper roll.

51. She then grabbed a contact solution container on the dresser. She threw it with whatever strength she had left at Petty's head.

    i. Upon information and belief, the attached exhibit is a photo of the contact solution Plaintiff threw at Petty after Petty raped her and refused to let her leave the room. This image comes directly from the evidence the Queens District Attorney collected on September 16, 1994. When this evidence was collected, Petty admitted via a video-recorded in-person Interrogation that he owned this bottle of contact solution and was the same bottle of contact solution in his room in his house. **Exhibit F**.

52. As Petty ducked from the contact solution, Plaintiff pushed him with all her might, he fell, and she sprinted down the stairs.

**"NOBODY IS GOING TO BELIEVE YOU"**

53. Petty quickly gets up and yells down the stairs as Plaintiff runs, a sentence that follows her for the rest of her life "NOBODY IS GOING TO BELIEVE YOU."

**SIXTEEN-YEAR-OLD PLAINTIFF
IMMEDIATELY REPORTS THE RAPE**

54. Plaintiff did not stop running and sprinted at least 20 blocks until she reached John Adams

High School.

55. Once there, she informed the school security guards of what had happened, and they immediately contacted the police.

56. Once the police arrived, they questioned Plaintiff. They placed her in a van to go to the house to confirm the location of her rape and to arrest Petty.

    i. Upon information and belief, the attached exhibit is the complaint report written by the NYPD on September 16, 1994. This document comes directly from the evidence the Queens District Attorney collected on September 16, 1994. **Exhibit G**.

57. Petty was still in the house where he raped Plaintiff and was arrested on the spot.

    i. Upon information and belief, the attached exhibit is the online booking arrest worksheet written by the NYPD on September 16, 1994. This document comes directly from the evidence the Queens District Attorney collected on September 16, 1994. **Exhibit H**.

58. Plaintiff confirmed his identity, and then the police took Petty to the police station and took Plaintiff to the hospital to be checked out.


### PETTY IS ARRESTED AND RELEASED ON $35,000.00 BAIL

59. On or about September 16, 1994, Petty was arrested for RAPING the Plaintiff and later released on $35,000.00 bond.

    i. Upon information and belief, the attached exhibit is the Intake Bureau arrest worksheet written by the NYPD on September 16, 1994. This document comes directly from the evidence the Queens District Attorney collected on September 16, 1994. **Exhibit I**.


### PETTY'S SPERMATOZOA ("SPERM" OR "SEMEN") IS FOUND
### IN THE PLAINTIFFS' VAGINA AND PETTY'S UNDERWEAR

60. On or about September 16, 1994, Plaintiff completed a rape kit at Jamaica Hospital's Emergency Department.

    i. Upon information and belief, the attached exhibit is the Jamaica Hospital Emergency Medicine Record from September 16, 1994. This document comes directly from the

evidence the Queens District Attorney collected on September 16, 1994.  **Exhibit J**.

61. On or about September 22, 1994, Chemist, Monica Brooks, provided a Police Laboratory Analysis Report which states in the relevant part,

> "Two vaginal smears and one pair of panties were positive for the presence of spermatozoa."

> "One pair of checker shorts were positive for the presence of spermatozoa."

    i. Upon information and belief, the attached exhibit is the Police Laboratory Analysis Report from September 22, 1994.  This document comes directly from the evidence the Queens District Attorney collected on September 22, 1994.  **Exhibit K**.

## PETTY WAS INDICTED FOR RAPE IN THE FIRST DEGREE, SEXUAL ABUSE IN THE FIRST DEGREE, UNLAWFUL IMPRISONMENT IN THE SECOND DEGREE, ASSAULT IN THE SECOND DEGREE, AND CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE

62. Upon information and belief, on or about September 21, 1994, Petty was indicted on five counts: Rape in the First Degree, Sexual Abuse in the First Degree, Unlawful Imprisonment in the Second Degree, Assault in the Second Degree, and Criminal Possession of a Weapon in the Fourth Degree.

    i. Upon information and belief, the attached exhibit is the September 21, 1994 Indictment. This document comes directly from the evidence the Queens District Attorney collected on September 21, 1994.  **Exhibit L**.

## PLAINTIFF PETTY PLEAD GUILTY TO ATTEMPTED RAPE IN 1995

63. On or about April 5, 1995, before Justice Arthur J. Cooperman of the Supreme Court of The State of New York County of Queens: Criminal Term, Part K-6, Defendant Petty pled the following:

> THE COURT: "Did you hear and understand the application and guilty plea she made to the Court a few moments ago on your behalf which was that she wishes to -- she said that you wish to re-instate your guilty plea that you had entered into in this case on November 10, 1994 in which you pleaded guilty to an attempted rape in the first degree

under the first count of the indictment."

"Is that what you wish to plead?"


THE DEFENDANT: "Yes"

THE COURT:  Have you had a full and complete opportunity to discuss your plea in this case with your lawyer and at the end of

that discussion, did you ask her to make this application for you?

THE DEFENDANT:  Yes.

THE COURT:  Do you now wish to withdraw your prior plea of not guilty and plead guilty at this time to the charge of attempted rape in the first degree under the first count of the indictment, a Class C violent felony, to cover all of the charges against you in this indictment?

THE COURT:  Are you pleading guilty because you are in fact, guilty?

THE DEFENDANT:  Yes.

THE COURT:  Has anybody threatened you, coerced you, or forced you to plead guilty?

THE DEFENDANT:  No.

THE COURT:  Are you pleading guilty voluntarily?

THE DEFENDANT:  Yes.

…

THE COURT: Do you now wish to waive all of these rights and plead guilty to the charge of attempted rape in the first degree?

THE DEFENDANT:  Yes.

THE COURT:  Do you understand that if your guilty plea is acceptable to the Court, it is the same as if you had a trial and were found guilty?

…

THE COURT:  By pleading guilty, are you admitting that on or about September 16, 1994, in the County of Queens, being male, you attempted to engage in sexual

intercourse with Jennifer Haugh, H-A-U-G-H, a female, by means of forcible compulsion.

Is that correct?

THE DEFENDANT:  Yes.

THE COURT:  Now, where did that take place?

THE DEFENDANT:  123-40 Elm Street.

THE COURT:  What's located at that address?

THE DEFENDANT: My grandmother's house.

THE COURT: And were you there with –

THE DEFENDANT: My grandmother

THE COURT: And

THE DEFENDANT: Jennifer

THE COURT: Were you in a room alone with her?

THE DEFENDANT:  Yes

THE COURT:  What did you attempt to do on that occasion?

THE DEFENDANT:  I attempted to rape her.

…

SANO: Did you hold that long knife when you had Jennifer Haugh in the bedroom with you?

THE DEFENDANT:  Yes.

SNAO:  Did you use that when you tried to throw her down on to the bed?

THE DEFENDANT:  Yes.

SNAO:  All in the room?

THE DEFENDANT:  Yes.

    i.    Upon information and belief, the attached exhibit is the Transcript of Defendant Petty's Plea/Sentence Hearing from May 4, 1995.  This document comes directly from the evidence collected by the Queens District Attorney on May 4, 1995.  **Exhibit M**.

64. As a result of the above-described conduct, the Plaintiff suffered and continues to suffer great

pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life. Plaintiff has sustained a loss of earnings and earning capacity.

## PLAINTIFF SUFFERS PHYSICAL VIOLENCE AS A RESULT OF DEFENDANT PETTYS PLEA

65. On the day of Petty's criminal proceeding, Plaintiff's family forced her to attend the hearing even though she did not have to be there. She was not testifying because Petty had already taken a plea deal. Plaintiff hid in the stairwell the whole time, mentally in shambles.

66. The Queens District Attorney happened to take the stairs that day and ran into the Plaintiff sitting on the stairs and asked what she was doing there. Plaintiff told the truth and said, "They are forcing me to drop the charges." The DA responded that she would handle it.

67. When everyone was in Court, the Judge asked if anyone had anything to say, and the Plaintiff stood up and stated that she wanted to drop the charges. The Judge did not find that statement very convincing and stated, "Take that up with the District Attorney."

68. Plaintiff was beaten at home that day because she was not convincing enough for the Judge. The family feared what would happen because Petty was now facing prison.

## THE ENSUING YEARS

69. Plaintiff was mentally and emotionally destroyed and attempted to find value and kindness in anything she could—partying, drugs, living in the streets, in and out of shelters. The Plaintiff's self-worth was at zero, her emotions were empty, and she was lost.

70. Plaintiff moved around a lot because she was too afraid to go back to New York for fear of someone recognizing her. Plaintiff had four children, numerous failed relationships, and never knew a true home in her entire life.

## KENNETH PETTY AND NICKI MINAJ
## INTIMIDATE AND HARASS PLAINTIFF

71. In 2016, Plaintiff moved to Atlanta, Georgia, where she met her husband, whom she wed in 2018. She was finally beginning to learn to be happy and love herself.

72. In 2018, Onika Tanya Maraj, "Nicki Minaj," posted that she was doing a turkey giveaway in Queens, New York, on Rockaway Blvd. and 147th Street. This attracted much attention given how big of a star Minaj is since Queens was her hometown.

73. According to the Recording Academy, Nicki Minaj is a female rap artist.

74. According to the Recording Academy Grammy Awards, Nicki Minaj has been nominated for 10 Grammys and has won 0.

75. According to Instagram, Minaj has over 224 million followers.

76. On November 25, 2018, Minaj posted a picture of her and Petty, the man who raped Plaintiff at knifepoint. It appeared that they were dating, and in the photo, they were throwing up gang signs.

77. Toward the end of November, Minaj posted another picture of her and Petty and replied to a comment stating, "Kenny was 15, she was 16 and, in a relationship, but go awf Internet." **Exhibit N**. Every publication, tabloid, iheartradio, USA Today, bloggers and YouTubers, etc., picked this up.

78. As a result of Minaj's post, Plaintiff was sought after for comment. Seeing no choice but to defend the truth, Plaintiff recorded an interview with a YouTube blogger, giving her side of the story. Plaintiff thought that would be the end of it.

## MINAJ USES HER CELEBRITY
## PLATFORM TO BASH PLAINTIFF

79. In November 2019, Minaj did a show called "shade no shade" on Queen Radio. She repeated the same comment that Petty was 15 years old but now added that he was "wrongly accused," "he did not have bail money," and said that Plaintiff had "written a letter recanting her statement" but would face 90 days in jail if Plaintiff had done so – which was all false.

80. Minaj also stated, "but white is right," because Plaintiff is biracial.

81. These statements by Minaj put social media in a frenzy trying to figure out who Plaintiff was

if she was a white woman, and where she currently lived.

## PETTY IS ARRESTED FOR
## FAILURE TO REGISTER AS A SEX OFFENDER

82. In March 2020, Petty was arrested for failing to register as a sex offender in California.

83. A few days after the arrest, Plaintiff was contacted by an old childhood friend, "Black." They caught up, and the topic of Plaintiff's rape came up, to which Plaintiff stated, "She wished it could all just go away forever." Black responded, "I can make that happen."

84. A few days later, Black called Plaintiff and informed her that Minaj had asked for Plaintiff's phone number and that he had given it to her. Shortly after that, Defendant Minaj contacted Plaintiff.

85. During the call, Minaj stated she heard Plaintiff was willing to "help out" their situation and stated that she would fly Plaintiff and her family to Los Angeles. Plaintiff declined this offer.

86. Minaj then stated she would send her publicist to meet with Plaintiff to craft a statement recanting Plaintiff's rape charge. Plaintiff denied this offer as well.

87. Before they got off the phone, Plaintiff said to Minaj, "I need you to know, woman to woman, that this happened." Minaj hung up the phone. Within days of this conversation, Plaintiff and her family suffered an onslaught of harassing calls and unsolicited visits.

## MINAJ SENDS HER ASSOCIATES AND ATTORNEYS
## TO HARASS AND INTIMIDATE PLAINTIFF

88. A few days after Minaj called Plaintiff, Plaintiff's brother called her. He stated two people reached out to a family member stating there was an offer of $500,000.00 from Minaj if Plaintiff wrote a letter recanting her rape claim against Petty. Plaintiff hung up, distraught that Minaj's instructed her associates to contact her brother and that her brother would even relay such a message.

89. This act by Minaj and her associates caused Plaintiff to panic because Black, who was in contact with Minaj, now knew where Plaintiff lived, where Plaintiff worked, and the identity of Plaintiff's kids.

## MINAJ SENDS LAWYERS AND
## INVESTIGATORS TO PLAINTIFF'S HOUSE

90. In April 2020, on behalf of Petty, factfinder/investigator Charles Mittlestalt from Georgia contacted Plaintiff. He put Plaintiff in contact with an attorney named Ian Wallach ("Attorney Wallach") from New York.

91. Minaj's legal team hired Attorney Wallach to give Plaintiff "legal advice" about recanting her statement.

92. Attorney Wallach stated he was the Plaintiff's lawyer, and anything said to him was protected under attorney-client privilege. Plaintiff did not know Attorney Wallach and had not contacted him for legal services.

93. Plaintiff told Attorney Wallach Minaj that Petty was sending people to her home and to the homes of her loved ones to get her to recant her true statement that Petty violently raped her.

94. Plaintiff told Attorney Wallach that Minaj and Petty were harassing her. Attorney Wallach promised to "help her," but his efforts were lackluster.


## MINAJ SENT BLACK TO PLAINTIFF'S HOUSE

95. Black continues to receive and relay messages from Defendant Petty to Plaintiff. For a while, Plaintiff ignored Black's calls. Plaintiff finally answered, and he told her that he had good news. Black stated that nothing would happen to Plaintiff if she signed and notarized some papers in his possession.

96. Shortly after the call, Black appeared in front of Plaintiff's home. To protect her children in her home, Plaintiff met Black in front of her in his car. While in his car, Black pulled out a green-colored folder with a document inside. This document was a written recanted statement prepared for Plaintiff to sign.

97. Black then pulls twenty thousand dollars out of the armrest and places it on the Plaintiff's lap. Plaintiff took the money off her lap and placed it on the floor. Plaintiff could not believe that Minaj would go this far to bribe her.

98. Black even said that Minaj would also send happy birthday videos to Plaintiff's daughter for her birthday as a bonus.

## PLAINTIFF SUFFERS

99. During these unsolicited calls, contacts, and communications, Plaintiff is having nightmares. The memories began to flood back from the day of her rape. She begins to experience anger, pain, sorrow, anxiety, and trust issues. The Plaintiff starts having crying fits and thoughts of paranoia.

100. At the end of May 2020, Plaintiff received a call from her brother, who spoke frantically. The brother stated that they knew where she lived and what her daughter does, and threatened to have someone else show up at the Plaintiff's house if she did not recant her 1994 rape claim.

101. After receiving this threat, Plaintiff moved in June 2020. She changed her phone number, registering her new number under her husband's name. These efforts by Plaintiff were unsuccessful in curbing the harassment and unwanted contact. Shortly after changing her number, Plaintiff was contacted by a lawyer who was instructed to reach out to her by Minaj.

102. Plaintiff became so paranoid that she moved again in August 2020.

## THE UNITED STATES MARSHALS
## CONTACTS PLAINTIFF HOUGH

103. Three days after moving in August 2020, the U.S. Marshals arrived at the Plaintiff's husband's job. She called the U.S. Marshals, and they stated that someone had called them to report that Plaintiff was being harassed, and they were worried about her safety.

104. The Marshals offered Plaintiff witness protection. The Marshals also confirmed with Plaintiff that the call she received from California was indeed Minaj.

## PLAINTIFF IS CONTACTED BY
## PETTY'S LEGAL COUNSEL

105. In September 2020, while visiting her brother in South Carolina, Plaintiff was once again harassed. Plaintiff gets a call from a New York Attorney stating that they represent Petty.

106. The attorney states they were trying to go to Court to get Petty off the sex offenders registry and asked about the recantment letter and if Plaintiff wrote it.

## PLAINTIFF HOUGH MOVES TO FLORIDA
## TO PROTECT HER FAMILY

107. In October 2020, Plaintiff's daughter was at an event in Atlanta, Georgia. At the end of the

night, Plaintiff's daughter and her friend group were approached by a man. The man asked, "do you know Zoo?" (Zoo is Petty's Street name). Plaintiff's daughter yelled at the man and left with her friends. Not even Plaintiff's daughter was safe from the intimidation tactics and harassment by Minaj.

108. After this incident, Plaintiff again feared for her and her family's safety, so she moved again, this time to Florida. She feared her child would be killed or kidnapped due to the threats from Minaj and Petty.

109. In November 2020, Plaintiff put a YouTube video out speaking about everything she had been going through to create a digital footprint just in case something happened to her.

110. Bloggers caught wind of the YouTube video and began victim-shaming her, telling their audiences that Plaintiff was lying, that she was just a white woman trying to make a quick dollar out of the limelight. Minaj's fans claimed, "Nicki said it was a lie, so it is a lie."

111. Plaintiff has not worked since May 2020 due to severe depression, paranoia, constant moving, harassment, and threats from Defendant Petty and his associates. She is currently living in isolation out of fear of retaliation.

### DEFENDANT PETTYS INTERMEDIARY PUBLICLY THREATENS PLAINTIFF HOUGH

112. On or about August 12, 2021, within days of Petty reaching a plea agreement in the Central District of California for failing to register as a sex offender, Defendant Petty's intermediary, Black, posted a threat to Plaintiff on his Instagram social media account.

113. In the post, Black said, "Case is over now," referring to the federal criminal case Petty accepted the plea deal for in the Central District of California.

114. The video went on to say:

"Jon Wayne tv coming soon tell that bitch she will be exposed case over now 20k, huh,"

"u know u don't fucked uped,"

"Jon wayne tv,"

"you lying ass bitch, 20 thousand,"

115.    Black ends the montage with a photo of two guns circled, with the words "be safe out here lol" written on the photo.  **Exhibit O**.

116.    In fear for her life and safety, Plaintiff filed a police report in Florida and has since moved to another state out of fear of being found and killed by Petty or one of his intermediaries.


<u>**COUNT I**</u>
<u>**Against Petty**</u>
<u>**Intentional Infliction of Emotional Distress (New York)**</u>

117.            Plaintiff repeats and realleges by reference all paragraphs above as though fully set forth herein.

118.    To state a claim for intentional infliction of emotional distress, a plaintiff must plead: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." <u>Howell v. N.Y. Post Co.</u>, 81 N.Y.2d 115, 122, 612 N.E.2d 699, 596 N.Y.S.2d 350 (1993); <u>see Turley v. ISG Lackawanna, Inc.</u>, 774 F.3d 140, 158 (2d Cir. 2014) (outlining test for intentional infliction of emotional distress).  <u>Frederick v. City of N.Y.</u>, No. 13-CV-897 (MKB), 2016 U.S. Dist. LEXIS 39828, at *81 (E.D.N.Y. March 25, 2016).

119.    Petty's extreme and outrageous conduct alleged in this complaint, including but not limited to sexual assault, rape, harassment, and intimidation, was intentionally and maliciously committed with intent to deliberately inflict humiliation, mental anguish, and emotional and physical distress upon Plaintiff, and done in wanton and reckless disregard of such consequences to Plaintiff.

120.    As a direct and proximate result of said extreme and outrageous conduct by Petty, Plaintiff did suffer humiliation, mental anguish, disassociation, suicidal ideation, and emotional and physical distress, and have been hurt and injured in her health, both mentally and physically, strength, activity, and her ability to lead an everyday life without mental anguish.  All of these have caused, continue to cause, and will continue to cause Plaintiff great mental and physical pain and suffering for the rest of her life.

121. As a result of such severe emotional and mental distress, Plaintiff has been generally, especially, and consequentially damaged in an amount to be established according to evidence.

122. Petty's behavior toward Plaintiff was so outrageous as to exceed all reasonable bounds of decency. Petty knew with substantial certainty or should have known that his behavior would cause Plaintiff to be a victim of sexual assault, sexual abuse, and sexual contact.

123. Petty knew with substantial certainty or should have known that his behavior would cause severe emotional distress to Plaintiff.

124. Petty committed the infliction of emotional, physical, and mental distress willfully and intentionally and through coercion, oppression, fraud, and malice and consciously disregarded Plaintiff's rights. Therefore, Plaintiff is entitled to an award of exemplary or punitive damages in an amount to be established at trial to meaningfully punish Petty, thereby deterring similar conduct in the future.

## COUNT II
## Against Petty
## Assault & Battery (New York)

125. Plaintiff repeats and realleges by reference all paragraphs above as though fully set forth herein.

126. Petty, through the conduct described further herein, created an unwarranted threat of violence against Plaintiff. Petty's conduct was made with the intent to provoke observation of the threat and cause a reasonable observation of the immediate danger. Petty has and possesses the present capacity to bring about violence.

127. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoying life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and enjoying life fully. Petty's actions and omissions warrant an award of punitive damages.

128. Recovering damages for an assault requires proof of physical conduct, placing the Plaintiff

in imminent apprehension of harmful contact. To recover damages for battery, a plaintiff must prove that there was bodily contact, that the contact was offensive, and that the Defendant intended to make contact without the Plaintiff's consent (see Holtz v Wildenstein & Co., 261 A.D.2d 336, 693 N.Y.S.2d 516; Roe v Barad, 230 A.D.2d 839, 647 N.Y.S.2d 14). Bastein v. Sotto, 299 A.D.2d 432, 433, 749 N.Y.S.2d 538, 539 (App. Div. 2002).

129. Petty committed a battery against Plaintiff because he intentionally engaged in unlawful, intentional, and offensive touching or application of force to Plaintiff's person. Here, Petty committed several acts of battery:

    i.   Petty grabbed Plaintiff from behind and placed a knife behind her back,

    ii.   Petty cut Plaintiff with the knife on her stomach as he wrestled with her to remove her pants,

    iii.   Petty grabbed Plaintiff by her sides to inflict pain to cause Plaintiff to release her pants,

    iv.   Petty forcibly inserted his erect penis into Plaintiff's vagina.

130. As a result of Petty's conduct, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, paranoia, depression, anxiety, economic harm, and other consequential damages.

131. The conduct of Petty described above was willful, wanton, and malicious. At all relevant times, Petty acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was sure to cause injury and humiliation to Plaintiff, and intended to cause fear, physical injury and pain, and suffering to Plaintiff. By the preceding, Plaintiff is entitled to recover punitive and exemplary damages from Petty.

132. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoying life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and enjoying life fully.

133.      Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

134.      Allegations of sexual intercourse by forcible compulsion, if proven, potentially constitute criminal rape under New York law.  See New York Penal Law § 130.35(1) ("A person is guilty of rape in the first degree when he or she engages in sexual intercourse with another person . . . [b]y forcible compulsion.").  "In the civil context, the common meanings of 'assault' and 'battery' subsume all forms of tortious menacing and unwanted touching." See Girden, 262 F.3d at 203 (quoting United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993) and citing 6A N.Y. Jur.  2d Assault—Civil Aspects § 2).  Rape indisputably encompasses civil assault and battery under New York law. United Nat'l Ins. Co., 994 F.2d at 108.  Antoine v. Brooklyn Maids 26, Inc., 489 F. Supp. 3d 68, 106 (E.D.N.Y. 2020).

135.    Petty, in doing the things herein alleged, including intending to subject Plaintiff to sexual abuse and harassment by Petty during Plaintiff's time as a sixteen-year-old high school student. Petty intended to cause harmful or offensive contact with Plaintiff's person or intended to put Plaintiff in imminent apprehension of such contact.

136.    In doing the alleged things, Plaintiff was put in imminent apprehension of Petty's harmful or offensive contact, and Petty made harmful or offensive contact with Plaintiff's person.

137.    Plaintiff did not consent to Petty's intended harmful or offensive contact with Plaintiff's person or intent to put Plaintiff in imminent apprehension of such contact.  Additionally, because Plaintiff was a minor during the time herein alleged, she could not consent to sexual contact with any person.

138.    In doing the alleged things, Petty violated Plaintiff's rights under Civil Code section 43 of protection from bodily restraint or harm and personal assault.

139.    As a result of the above-described conduct, the Plaintiff suffered and continues to suffer great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of

life; has suffered and continues to suffer and was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life. Plaintiff has sustained a loss of earnings and earning capacity.

140.     In subjecting the minor Plaintiff to the wrongful treatment herein described, Petty acted willfully and maliciously with intent to harm Plaintiff and in conscious disregard of Plaintiff's rights to constitute malice and oppression. Therefore, the Plaintiffs are entitled to the recovery of punitive damages, in an amount determined by the Court, against Petty, in a sum to be shown according to proof.

141.     Defendant Petty's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Plaintiff's rights, for which Plaintiff is entitled to an award of punitive damages.

### COUNT IV
### Against Petty
### Negligent Infliction of Emotional Distress (New York)

142.             Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

143.     Negligent infliction of emotional distress requires a showing of (1) extreme and outrageous conduct, (2) a causal connection between the conduct and the injury, and (3) severe emotional distress. Simpson v. Uniondale Union Free Sch. Dist., 702 F. Supp. 2d 122, 134 (E.D.N.Y. 2010); see Higgins, 318 F.3d 422, 425 n.1 (2d Cir. 2003) (stating that to be actionable, intentional and negligent infliction of emotional distress claims must "be based on conduct that is extreme and outrageous."); Naughright v. Weiss, No. 10 Civ. 8451, 826 F. Supp. 2d 676, 2011 U.S. Dist. LEXIS 133742, at *45-46 (S.D.N.Y. November 18, 2011) ("A cause of action for either intentional or negligent infliction of emotional distress must allege that defendants' conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Romero v. City of N.Y., 839 F. Supp. 2d 588, 631 (E.D.N.Y. 2012)

144.     Here, the actions of Petty rise beyond the threshold of extreme and outrageous. As previously mentioned, Petty viciously raped Plaintiff and admitted doing so within hours of

committing the act.

145. In the days, months, and years preceding his criminal act, Petty, his enabling parents, associates, legal team, gang affiliates, agents, and servants worked in concert and engaged in conduct beyond the threshold of extreme and outrageous. The extreme and outrageous conduct are as follows:

   i. Stalking Plaintiff,

   ii. Stalked Plaintiff's twenty-two-year-old daughter,

   iii. Stalking Plaintiff's family members,

   iv. Causing Plaintiff to move residents on multiple occasions throughout the years,

   v. Bribing Plaintiff into recanting her rape claim,

   vi. Threatening Plaintiff with physical bodily harm if she did not recant her rape claim, and

   vii. Threatening Plaintiff with death via social media posts.

146. Under California law, NIED has the following elements: (1) a legal duty to use reasonable care, (2) a breach of that duty, and (3) proximate [or legal] cause between the breach and (4) the Plaintiff's injury." Keen v. American Home Mortg. Servicing Inc., 664 F. Supp. 2d 1086, 1096 (E.D. Cal. 2009) (quoting Mendoza v. City of Los Angeles, 66 Cal. App. 4th 1333, 1339, 78 Cal. Rptr. 2d 525 (1998)). Mountjoy v. Bank of Am. N.A., No. 2:15-cv-02204-TLN-DB, 2018 U.S. Dist. LEXIS 3216, at *28 (E.D. Cal. January 8, 2018).

147. Here, in 1994 Petty accepted a plea deal after savagely raping Plaintiff. Petty was prohibited from directly or indirectly contacting Plaintiff as part of that plea deal. The purpose of that plea agreement provision is to protect Plaintiff from experiencing a further injury that direct or indirect contact from Petty may cause. As a result of this agreement, Petty assumed a duty to prevent Plaintiff from experiencing such harm. On multiple occasions, Petty negligently violated the duty he owed Plaintiff.

148. Petty's actions endangered Plaintiff's safety and caused her to fear for her and her family's safety.

149. As a result of the above-described conduct, Plaintiff has suffered and continues to suffer

physical injury, psychological injury, emotional injury, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life. Plaintiff has been prevented and will continue to be prevented from performing her daily activities and enjoying life fully.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant Petty, jointly and severally, as follows:

a. For past, present, and future general damages in an amount to be determined at trial;

b. For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

c. Any appropriate statutory damages;

d. For costs of suit;

e. For interest as allowed by law;

f. For attorney's fees;

g. The cause of action authorized any appropriate punitive or exemplary damages against Defendant Petty;

h. For such other and further relief as the Court may deem proper.

Dated: December 13, 2023

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.